**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| SCOTT FRANKLIN, JR., derivatively on behalf of SEALED AIR CORPORATION,<br><br>    Plaintiff,<br><br>    vs.<br><br>EDWARD L. DOHENY, JEROME A. PERIBERE, CAROL P. LOWE, WILLIAM G. STIEHL, MICHAEL CHU, LAWRENCE R. CODEY, PATRICK DUFF, HENRY R. KEIZER, JACQUELINE P. KOSECOFF, NEIL LUSTIG, KENNETH P. MANNING, WILLIAM J. MARINO, RICHARD L. WAMBOLD, and JERRY R. WHITAKER,<br><br>    Defendants,<br><br>    and<br><br>SEALED AIR CORPORATION,<br><br>    Nominal Defendant. | C.A. No. _____<br><br><br><br><br>**DEMAND FOR JURY TRIAL** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

### INTRODUCTION

Plaintiff Scott Franklin ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Sealed Air Corporation ("Sealed Air" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Edward L. Doheny, Jerome A. Peribere, Carol P. Lowe, William G. Stiehl, Michael Chu, Lawrence R. Codey, Patrick Duff, Henry R. Keizer, Jacqueline P. Kosecoff, Neil Lustig, Kenneth P. Manning, William J. Marino, Richard L. Wambold, and Jerry R. Whitaker (collectively, the "Individual Defendants," and together with Sealed Air, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Sealed Air, unjust enrichment, waste of corporate assets, and violations of

Section 14(a), 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Sealed Air, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Sealed Air's directors and officers from at least November 5, 2014 to August 6, 2018 (the "Relevant Period").

2.      Sealed Air is a packaging solutions company operating in food, industrial manufacturing, electronics, and e-commerce markets across the globe. The Company specializes in the development, manufacture, and distribution of packaging materials, including the well-known brands Bubble Wrap and Cryovac shrink wrap.

3.      In 1998, Sealed Air acquired Cryovac from chemical company W.R. Grace & Co. ("W.R. Grace").  Two years later, in 2000, Sealed Air was named a defendant in multiple lawsuits claiming that the Cryovac acquisition was a fraudulent conveyance, and Sealed Air was responsible for W.R. Grace's asbestos liabilities that were pending at the time of the conveyance under a theory of successor liability.  W.R. Grace subsequently filed for bankruptcy, and in 2005,

a settlement agreement was executed by the parties in the asbestos litigation and approved by the bankruptcy court (the "Settlement").

4.      W.R. Grace finally emerged from bankruptcy in February 2014, and pursuant to the Settlement, Sealed Air[1] paid $930 million and 18 million Sealed Air shares of stock into trusts that were set up to resolve the asbestos claims.

5.      Sealed Air's then CEO Jerome Peribere announced the final settlement in glowing terms:

> This is very positive news for Sealed Air, as the completion of the settlement has been anticipated for some time and now brings finality to a matter after more than a decade of preparation. It resolves asbestos-related claims against Sealed Air associated with W. R. Grace & Co. . . . We will no longer incur interest on the settlement, which amounted to $48 million in 2013. Additionally, we anticipate meaningful cash tax benefits over the next several years that will provide cash that we can use to continue to add value to our business.

6.      As a result of the Settlement payout, the Company recorded a $1.49 billion income tax deduction and claimed a net operating loss with respect to its 2014 U.S. taxes.  The Company carried back these losses for ten years, allowing them to use the loss to offset any profits for the prior ten years.  Ultimately, the Company was able to claim a $250 million tax refund and $275 million deferred tax asset that would carry forward.

7.      In November 2014, as the Company was completing its accounting of the improper $1.49 billion tax deduction, the Company abruptly dismissed KPMG LLP ("KPMG") as its auditor, retaining Ernst & Young LLP ("EY") in its place.  After its dismissal, KPMG stated it was "not in a position to agree or disagree with the Company's statement that EY was not engaged regarding the application of accounting principles to a specified transaction or the type of audit

---

[1] Sealed Air additionally settled the fraudulent transfer litigation, agreeing to contribute to the settlement of the W.R. Grace asbestos litigation.

opinion that might be rendered on the Company's consolidated financial statements, or the effectiveness of internal control over financial reporting."

8.      In its Form 10-K filed with the Securities and Exchange Commission ("SEC") on February 27, 2015, the Company disclosed that the Internal Revenue Service ("IRS") intended to disallow the deduction in its entirety, on the basis that the deduction was not proper.  The Company denied the IRS's position, holding that it has "meritorious defenses" related to the disallowance. The Company's dispute with the IRS remains ongoing.

9.      In its Form 10-Q filed with the SEC on August 6, 2018 (the "2Q 2018 10-Q"), the Company disclosed that the SEC had initiated an investigation into the Company's Accounting procedures related to the $1.49 billion tax deduction.  The Company stated that the SEC had issued a subpoena on June 25, 2018 pertaining to, *inter alia*, its accounting for income taxes and financial reporting and disclosures ("June 2018 Subpoena").

10.      In response to this disclosure, the Sealed Air stock price dropped more than 5% to close at $41 per share on August 7, 2018.  The stock price would further decline over the next several weeks, down to just above $30 per share by October 2018.

11.      Then, on June 20, 2019, Sealed Air disclosed that the SEC had issued it a second subpoena.  The second subpoena pertained to documents related to Sealed Air's procedure for appointing EY to replace KPMG as the Company's auditor, as well as documents concerning the independence of EY as auditor of the Company.

12.      In response to the SEC subpoenas, the Company's Audit Committee began an internal review (the "Audit Committee Investigation") of the Company's accounting practices and procedures, as well as the selection of EY as auditor.  On June 20, 2019, the Company filed with the SEC a Form 8-K (the "June 20, 2019 8-K") announcing that as a result of the Auditing

Committee's internal investigation, it had terminated "for cause" Chief Financial Officer Defendant Stiehl, who had served as CFO since 2017.

13.     Then, on August 2, 2019, the Company disclosed that it had received a grand jury subpoena from the U.S. Attorney for the Western District of North Carolina related to (1) Sealed Air's selection of an auditor, beginning in fiscal year 2015 and (2) the termination of Defendant Stiehl.

14.     On August 12, 2019, the Company filed with the SEC a Form 8-K in which the Company announced that it had dismissed EY as a result of the SEC's June 2019 Subpoena.

15.     Sealed Air's fraudulent scheme has thus led to an SEC investigation as well as a criminal investigation by the U.S. Attorney for the Western District of North Carolina. Moreover, Sealed Air's CFO was terminated "for cause," and the Company has now dismissed EY after the SEC initiated an investigation into the process by which EY was selected, as well as the circumstances surrounding the CFO's termination.

16.     During the Relevant Period, the Individual Defendants breached their fiduciary duties to Sealed Air by personally making and/or causing the Company to make false and misleading statements concerning the effectiveness of the Company's internal controls and compliance with relevant financial reporting principles.  Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company's $1.49 billion deduction pursuant to the Settlement was improper and undertaken for the sole purpose of artificially inflating the Company's financials and stock price; (2) the Company had appointed EY as its auditor as the result of a flawed and conflicted process and for the sole purpose of colluding in the improper tax deduction and related accounting; (3) the Company's earnings, cash flows, and

operating income were overstated during the Relevant Period; (4) as a result of the foregoing, the Company's financial statements were materially false and misleading and violated the tenets of Generally Accepted Accounting Practices ("GAAP"); and (5) the Company failed to maintain internal controls.

17.     As a result of the foregoing, the Individual Defendants' and the Company's public statements were materially false and misleading at all relevant times.  The Individual Defendants failed to correct and caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

18.     Additionally, in breach of their fiduciary duties, the Individual Defendants' willfully or recklessly caused the Company to fail to maintain internal controls.

19.     Furthermore, the Individual Defendants breached their fiduciary duty by causing the Company to repurchase its own stock at artificially inflated prices while two of the Individual Defendants engaged in insider sales during the Relevant Period while the price of the Company's stock was artificially inflated, netting proceeds of $568,745, collectively.

20.     The Individual Defendants' breaches of fiduciary duty and other misconduct have subjected the Company, the Company's current Chief Executive Officer ("CEO"), the Company's former CEO, and two of the Company's former Chief Financial Officers ("CFOs") to a federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of New York (the "Securities Class Action"), the need to undertake internal investigations, the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly over-compensated by the Company, and will likely cost the Company, going forward, millions of dollars.

21.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action, the current and former CEOs' liability in the Securities Class Action, the two former CFOs' liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested or independent directors, a majority of Sealed Air's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder.

23.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

24.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

25.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

26.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation incorporated in this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

27.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

28.     Venue is proper in this District because Sealed Air and the Individual Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

29.     Plaintiff is a current shareholder of Sealed Air common stock and has continuously held Sealed Air common stock at all relevant times.

### Nominal Defendant Sealed Air

30.     Sealed Air is a Delaware corporation with its principal executive offices at 2415 Cascade Pointe Boulevard, Charlotte, North Carolina 28208. Sealed Air's shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "SEE."

### Defendant Doheny

31.     Defendant Edward L. Doheny II ("Doheny") has served as President and CEO of the Company since January 1, 2018. He joined the Company as Chief Operating Officer and CEO-Designate in September 2017. According to the Company's Schedule 14A filed with the SEC on April 4, 2019 (the "2019 Proxy Statement"), as of March 18, 2019, Defendant Doheny beneficially owned 82,486 shares of the Company's common stock. Given that the price per share of the

Company's common stock at the close of trading on March 18, 2019 was $45.26, Defendant Doheny owned approximately $3.7 million worth of Sealed Air stock.

32.    For the fiscal year ended December 31, 2018, Defendant Doheny received $8,934,227 in compensation from the Company. This included $1,150,000 in salary, $7,725,109 in stock awards, and $59,118 in all other compensation.

33.    The Company's 2019 Proxy Statement said the following about Defendant Doheny:

Mr. Doheny is the President and Chief Executive Officer of Sealed Air. Mr. Doheny joined Sealed Air as Chief Operating Officer and CEO-Designate and a director in September 2017. He became President and CEO effective January 1, 2018. Mr. Doheny previously served at Joy Global Inc., where he was President and Chief Executive Officer and a director from December 2013 through May 2017 and was Executive Vice President, as well as President and Chief Operating Officer of Joy Global's Underground Mining Machinery business, from 2006 to 2013. Prior to joining Joy Global, Mr. Doheny had a 21-year career with Ingersoll-Rand Co., where he held a series of senior executive positions of increasing responsibility, including President of Industrial Technologies from 2003 to 2005 and President of the Air Solutions Group from 2000 to 2003.

Mr. Doheny is a director of John Bean Technologies Corporation, where he serves on the compensation committee and the nominating and governance committee.

Mr. Doheny earned a bachelor of science degree in engineering from Cornell University and a master's degree from Purdue University's Krannert School of Management.

Mr. Doheny brings more than 30 years of experience leading global manufacturers of highly mechanized equipment and systems, including a keen focus on solutions, service and operational excellence and a proven ability to drive profitable innovation-based growth strategies.

**Defendant Peribere**

34.    Defendant Jerome A. Peribere ("Peribere") served as the Company's President and Chief Executive Officer from 2012 until his retirement in December 2017.

35.    According to the Company's Schedule 14A filed with the SEC on April 5, 2018 (the "2018 Proxy Statement"), for the fiscal year ended December 31, 2017, Defendant Peribere

received $10,888,951 in compensation from the Company.  This included $1,250,000 in salary, $7,559,026 in stock awards, $2,055,625 in non-equity incentive plan compensation, and $24,300 in all other compensation.

36.     The Company's Schedule 14A filed with the SEC on April 6, 2017 (the "2017 Proxy Statement") said the following about Defendant Peribere:

> Mr. Peribere is the President and Chief Executive Officer of Sealed Air since March 1, 2013. Prior to such position, Mr. Peribere served as the President and Chief Operating Officer of Sealed Air and was elected to the Board of Directors in September 2012. Prior to joining Sealed Air, Mr. Peribere worked at The Dow Chemical Company, or Dow, from 1977 through August 2012. Mr. Peribere served in multiple managerial roles with Dow, most recently as Executive Vice President of Dow and President and Chief Executive Officer, Dow Advanced Materials, a unit of Dow, from 2010 through August 2012. Mr. Peribere currently serves as a board member of Xylem Inc. Mr. Peribere previously served as a director of BMO Financial Corporation. Mr. Peribere graduated with a degree in business economics and finance from the Institut D'Etudes Politiques in Paris, France.

> Mr. Peribere brings his extensive leadership, global operations, strategy and integration experience to the Board.

**Defendant Stiehl**

37.     Defendant William G. Stiehl ("Stiehl") served as the Company's Senior Vice President and CFO from June 2018 until his termination for cause in June 2019.  Before that, he served as interim CFO from 2017 to 2018. According to the 2019 Proxy Statement, as of March 18, 2019, Defendant Stiehl beneficially owned 45,101 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 18, 2019 was $45.26, Defendant Stiehl owned approximately $146,356 worth of Sealed Air stock.

38.     For the fiscal year ended December 31, 2018, Defendant Stiehl received $1,356,645 in compensation from the Company. This included $431,979 in salary, $125,000 in bonuses, $388,600 in stock awards, $379,050 in non-equity incentive plan compensation, and $32,016 in all other compensation.

39.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Stiehl, who made no purchases of Company stock, made the following sales of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| 6/19/18 | 3,000 | $44.01 | $132,030 |
| 12/15/2017 | 3,000 | $48.98 | $146,940 |
| 5/19/2017 | 3,000 | $43.43 | $130,290 |

Thus, in total, before the fraud was expose, he sold 9,000 Company shares on inside information, for which he received approximately $409,260.  His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

**Defendant Lowe**

40.     Defendant Carol P. Lowe ("Lowe") served as the Company's Senior Vice President and Chief Financial Officer from June 8, 2012 to October 31, 2017.

41.     According to the 2018 Proxy Statement, for the fiscal year ended December 31, 2017, Defendant Lowe received $1,662,848 in compensation from the Company. This included $536,832 in salary, $1,101,716 in stock awards, and $24,300 in all other compensation.

**Defendant Chu**

42.     Defendant Michael Chu ("Chu") is a co-founder of the Company and has served as a Company director since 2002.  He is also a member of the Organization and Compensation Committee.  According to the 2019 Proxy Statement, as of March 18, 2019, Defendant Chu beneficially owned 31,133 shares of the Company's common stock. Given that the price per share

of the Company's common stock at the close of trading on March 18, 2019 was $45.29, Defendant

Chu owned approximately $1.4 million worth of Sealed Air stock.

43.     For the fiscal year ended December 31, 2018, Defendant Chu received $215,025 in

compensation from the Company. This included $100,000 in salary, and $115,025 in stock awards.

44.     The Company's 2019 Proxy Statement stated the following about Defendant Chu:

Mr. Chu is Co-Founder and has been the Managing Director of IGNIA Fund, a venture capital firm based in Monterrey, Mexico, dedicated to investing in commercial enterprises serving low-income populations in Mexico, since July 2007. Mr. Chu was a Founding Partner of Pegasus Capital, a private investment firm deploying equity capital in Latin America, where he has served as Senior Advisor since June 2007 and previously served as Senior Partner and Managing Director from August 2000 to June 2007. Mr. Chu has been a Senior Lecturer on the faculty of the Harvard Business School since July 2003 and trustee emeritus of Dartmouth College.

Mr. Chu serves as a director of Arcos Dorados Holdings, Inc., a public company that operates and franchises McDonald's restaurants in Latin America and is the world's largest McDonald's franchisee, and Takeoff Technologies, a private start-up company in eGrocery. His experience includes serving as a management consultant with Boston Consulting Group, in senior management positions with U.S. corporations, and as an executive and limited partner of Kohlberg Kravis Roberts & Co., a private equity firm. Additionally, he is director emeritus of ACCION International, a non-profit corporation dedicated to microfinance. Mr. Chu previously served as the President and CEO of ACCION International.

Mr. Chu received a bachelor of arts degree from Dartmouth College and a master's degree in business administration with highest distinction from Harvard Business School.

Mr. Chu brings to the Board of Directors extensive international experience, particularly in the increasingly important region of Latin America, where Mr. Chu grew up. Mr. Chu has proven leadership capabilities and an entrepreneurial vision, as demonstrated by his roles with IGNIA and Pegasus Capital. He also has experience as a CFO and extensive involvement in mergers and acquisitions.

**Defendant Codey**

45.     Defendant Lawrence R. Codey ("Codey) served as a company director from 1993

until his retirement in 2018.  According to the 2019 Proxy, for the fiscal year ended December 31,

2018, Defendant Codey received $5,000 in compensation from the Company. This included $5,000 in fees earned or paid in cash.

46. During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Codey, who made no purchases of Company stock, made the following sales of Company stock:

| Date | Number of Shares | Price | Proceeds |
|------|------------------|-------|----------|
| 9/18/17 | 3,500 | $42.91 | $150,185 |
| 8/9/16 | 200 | $46.50 | $9,300 |

Thus, in total, before the fraud was exposed, he sold 3,700 Company shares on inside information, for which he received approximately $159,485.  His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

47.    The Company's Schedule 14A filed with the SEC on April 8, 2016 (the "2016 Proxy Statement") stated the following about Defendant Codey:

> Mr. Codey is a retired President and Chief Operating Officer of Public Service Electric and Gas Company (PSE&G), a public utility. Currently, Mr. Codey serves as a director of New Jersey Resources Corporation, a natural gas holding company, where he is lead director and chairs the executive committee and also serves on the nominating/corporate governance committee and audit committee. Further, he serves as a director of Horizon Blue Cross Blue Shield of New Jersey, a health insurance company, where he is a member of the audit committee and the governance committee. Mr. Codey previously served on the board of United Water Resources, a subsidiary of Suez Environment. Neither Horizon Blue Cross Blue Shield of New Jersey nor United Water Resources is a public company.

> Mr. Codey received his bachelor of science degree from St. Peter's College, a juris doctor degree from Seton Hall School of Law, and a master's degree in business administration from Rutgers University. In addition, he completed the Advanced Management program at Harvard University's School of Business. Mr. Codey's career at PSE&G started as a trial attorney and then as a Vice President in charge of preparation and presentation of utility rate proceedings before both federal and state regulatory bodies. Thereafter, Mr. Codey was in charge of the gas business

unit and subsequently the electric business unit. Mr. Codey previously served on the Board of Directors of Public Service Enterprise Group, an energy holding company of which PSE&G was its largest subsidiary. Mr. Codey has served on numerous governmental and non-governmental boards and commissions, including the EPA Clean Air Act Advisory Committee under both President George W. Bush and President William J. Clinton. In addition to the knowledge gained from his experience as our director, Mr. Codey has a broad background of experience and education in the areas of executive management, general management, legal and regulatory matters, finance, accounting, human resource management, legislative and governmental affairs, environmental affairs, and operations. He has been accountable for the performance of large, complex, multi-disciplined organizations and brings that discipline to the Board. Mr. Codey also brings to the Board the experience of a director who has served in various leadership capacities across an array of companies involved in energy, utilities and government.

**Defendant Duff**

48.     Defendant Patrick Duff ("Duff") has served as a Company director since 2010. He also serves as the Chair of the Nominating and Corporate Governance Committee and is a member of the Audit Committee. According to the 2019 Proxy Statement, as of March 18, 2019, Defendant Duff beneficially owned 88,655 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 18, 2019 was $45.29, Defendant Duff owned approximately $4 million worth of Sealed Air stock.

49.     For the fiscal year ended December 31, 2018, Defendant Duff received $230,040 in compensation from the Company. This included $25,000 in fees earned and $205,040 in stock awards.

50.     The Company's 2019 Proxy Statement stated the following about Defendant Duff:

Mr. Duff is a general partner of Dunham Partners, LLC, a private investment firm. Previously, he served as a director of Hercules, Inc., a manufacturing company. While at Hercules, Mr. Duff was chairman of the audit committee and served on the corporate governance, nominating and ethics committee, emergency committee and finance committee.

Mr. Duff received his bachelor of science degree in accounting from Lehigh University and a master of business administration degree from the Columbia Graduate School of Business. He taught security analysis at Columbia University from 1993 until 1999. Formerly, Mr. Duff was a senior managing director at Tiger

Management Corp., an investment management firm, from 1989 through December 1993, where he was a member of the management committee. Prior to joining Tiger in 1989, Mr. Duff worked in asset management at Mitchell Hutchins and Capital Builders Advisory Services. He is a certified public accountant and a chartered financial analyst. Mr. Duff has an extensive knowledge of investing, asset management and financial markets gained from his experience with Tiger and with prior employers as well as through his teaching position at Columbia University. He brings a unique perspective to the Board as a stockholder and investor. In addition, he has accounting and financial expertise. He also has prior board experience, including service on a public company board.

**Defendant Keizer**

51.     Defendant Henry R. Keizer ("Keizer") has served as a Company director since 2016 and serves as Chair of the Audit Committee, in addition to serving on the Nominating and Corporate Governance Committee. According to the 2019 Proxy Statement, as of March 18, 2019, Defendant Keizer beneficially owned 7,019 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 18, 2019 was $45.29, Defendant Keizer owned approximately $317,188 worth of Sealed Air stock.

52.     For the fiscal year ended December 31, 2018, Defendant Keizer received $226,275 in compensation from the Company. This included $111,250 in fees earned or paid in cash and $115,025 in stock awards.

53.     The Company's 2019 Proxy Statement stated the following about Defendant Keizer:

Mr. Keizer formerly served as Deputy Chairman and Chief Operating Officer of KPMG, the U.S.-based and largest individual member firm of KPMG International or KMPGI, a role from which he retired in December 2012. KPMGI is a professional services organization that provides audit, tax and advisory services in 152 countries. Mr. Keizer previously held a number of key leadership positions throughout his 35 years at KPMG, including Global Head of Audit from 2006 to 2010 and U.S. Vice Chairman of Audit from 2005 to 2010.

Mr. Keizer currently serves as Chairman of the Board and as a director of Hertz Global Holdings, Inc., where he chairs the audit committee and serves on the financing committee and the nominating and governance committee. He is a trustee

of BlackRock Funds, a director of WABCO Holdings Inc., where he chairs the audit committee, and a director of Park Indemnity Ltd., a privately held Bermuda captive insurer affiliated with KPMGI. He previously served as a director and audit committee chair of MUFG Americas Holdings, Inc. and MUFG Union Bank, a financial and bank holding company and of Montpelier Re Holdings, Ltd., a global property and casualty reinsurance company until it merged with Endurance Specialty Holdings Ltd. in July 2015. Mr. Keizer was a director of the American Institute of Certified Public Accountants from 2008 to 2011.

Mr. Keizer holds a bachelor's degree in accounting, summa cum laude, from Montclair State University, New Jersey.

Mr. Keizer has significant management, operating and leadership skills gained as Deputy Chairman and Chief Operating Officer of KPMG and as a director of multiple public and private companies. Mr. Keizer, a certified public accountant, has extensive knowledge and understanding of financial accounting, internal control over financial reporting and auditing standards from his many years of experience and key leadership positions he held with KPMG. Mr. Keizer also has over four decades of diverse industry perspective gained through advising companies engaged in manufacturing, banking, insurance, consumer products, retail, technology and energy, providing him with perspective on the issues facing major companies and the evolving global business environment. Mr. Keizer's extensive leadership experience at KPMG provides the Board with expertise in risk management and oversight over our domestic and international operations.

**Defendant Kosecoff**

54.     Defendant Jacqueline B. Kosecoff ("Kosecoff") has served as a Company director since 2005 and is a member of the Nominating and Corporate Governance Committee and the Organization and Compensation Committee. According to the 2019 Proxy Statement, as of March 18, 2019, Defendant Kosecoff beneficially owned 37,967 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 18, 2019 was $45.29, Defendant Kosecoff owned approximately $1.7 million worth of Sealed Air stock.

55.    For the fiscal year ended December 31, 2018, Defendant Kosecoff received $232,525 in compensation from the Company. This included $117,500 in fees earned and $115,025 in stock awards.

56.    The Company's 2019 Proxy Statement stated the following about Defendant Kosecoff:

Dr. Kosecoff works in private equity to identify, select, mentor and manage health services and IT companies. Since March 2012 she has been a managing partner at Moriah Partners, LLC and a senior advisor to Warburg Pincus. From 2002 to 2012, Dr. Kosecoff was a senior executive at UnitedHealth Group-PacifiCare. Dr. Kosecoff joined UnitedHealth Group as part of its acquisition of PacifiCare Health Systems in 2005. At PacifiCare, Dr. Kosecoff served as Executive Vice President with responsibility for its specialty businesses, including its PBM, the Medicare Part D Drug Program, PacifiCare Behavioral Health, PacifiCare Dental & Vision, and Women's Health Solutions. Upon joining United, Dr. Kosecoff took responsibility for the Medicare Part D business, pharmacy services for United's senior, legacy PacifiCare and external PBM business, as well as the consumer health product division serving seniors. In 2007, Dr. Kosecoff was appointed CEO of Prescription Solutions (now known as OptumRx) with responsibility for United's PBM, Specialty Pharmacy and Consumer Health Products, providing services as of 2011 to more than 13 million members with annual revenue of $18.5 billion. In 2011, Dr. Kosecoff was named Senior Advisor by Optum, which encompasses the health services businesses of UnitedHealth Group, consisting of OptumHealth, OptumInsight and OptumRx, to help identify and develop new growth and collaborative opportunities. She previously founded information technology and drug development businesses in the medical field and was on the faculty of the Schools of Medicine and Public Health at the University of California, Los Angeles. She was a consultant to the World Health Organization's Global Quality Assessment Programs and has served on the Institute of Medicine's Board of Health Care Services, the RAND Graduate School's Board of Governors, and the Board of Directors for ALARIS, City of Hope, the Alliance for Aging Research, and the Pharmaceutical Care Management Association.

Dr. Kosecoff is a director of: Houlihan Lokey, Inc., a global investment bank, providing mergers and acquisitions, capital markets, financial restructuring, and financial advisory services, where she serves on the audit and the nominating and corporate governance committee; and STERIS Corporation, a provider of infection prevention, contamination control and surgical and critical care technologies, where she is a member of the compensation committee and the nominating and corporate governance committee. She also sits on several non-public boards – Alignment Healthcare; Amino; GoodRx, Inc.; Independent Living Systems, LLC;

and Specialist on Call where she is the Chair of the board of directors and a member of the compensation committee.

Dr. Kosecoff received a bachelor of arts degree from the University of California, Los Angeles, a master of science degree in applied mathematics from Brown University, and a Ph.D. degree in research methods from the University of California, Los Angeles.

Dr. Kosecoff is a seasoned health care executive. Dr. Kosecoff brings to the Board of Directors her outstanding background as a business leader in the medical field. Sealed Air benefits from her experience in leading complex operations and in strategic planning. Additionally, Dr. Kosecoff brings an entrepreneurial direction to Sealed Air.Mr. Keizer formerly served as Deputy Chairman and Chief Operating Officer of KPMG, the U.S.-based and largest individual member firm of KPMG International or KMPGI, a role from which he retired in December 2012. KPMGI is a professional services organization that provides audit, tax and advisory services in 152 countries. Mr. Keizer previously held a number of key leadership positions throughout his 35 years at KPMG, including Global Head of Audit from 2006 to 2010 and U.S. Vice Chairman of Audit from 2005 to 2010.

**Defendant Lustig**

57.     Defendant Neil Lustig ("Lustig") has served as a Company director since 2015 and is a member of the Audit Committee and Nominating and Corporate Governance Committee. According to the 2019 Proxy Statement, as of March 18, 2019, Defendant Lustig beneficially owned 12,110 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 18, 2019 was $45.29, Defendant Lustig owned approximately $548,461 worth of Sealed Air stock.

58.     For the fiscal year ended December 31, 2018, Defendant Lustig received $222,525 in compensation from the Company. This included $107,500 in fees earned or paid in cash and $115,025 in stock awards.

59.     The Company's 2019 Proxy Statement stated the following about Defendant Lustig:

Mr. Lustig was elected to the Board of Directors in May 2015. Mr. Lustig has served as CEO of GAN Integrity Inc. since March 2019. Mr. Lustig served as President and CEO of Sailthru, Inc. from March 2015 until its acquisition by The

CM Group in January 2019. Mr. Lustig served at Vendavo Inc., where he was Senior Vice President Global Sales from August 2007 to September 2010 before becoming President and CEO in September 2010. After retiring as President and CEO in October 2014, Mr. Lustig served as an advisor to Vendavo from October 2014 to October 2015. Mr. Lustig worked at Ariba, Inc. from 2001 to 2007, serving in multiple managerial roles in Ariba's U.S. and European businesses, and started his career in technology at IBM, where he held a variety of engineering, sales and management roles over a sixteen year period.

Mr. Lustig received a bachelor of science degree in computer science and applied mathematics from the State University of New York at Albany.

Mr. Lustig has more than 25 years of experience in software, hardware and cloud technology industries. His education, business management experience and knowledge of software, hardware and cloud technology industry are valuable to Sealed Air, including in connection with our innovation strategies.

**Defendant Manning**

60.     Defendant Kenneth P. Manning ("Manning") served as a Company director from 2002 to 2017.

61.     For the fiscal year ended December 31, 2016, Defendant Manning received $222,497 in compensation from the Company.  This included $107,500 in fees earned or paid in cash and $114,997 in stock awards.

62.     The Company's 2016 Proxy stated the following about Defendant Manning:

Mr. Manning is the Chairman of Sensient Technologies Corporation, a global manufacturer and marketer of colors, flavors and fragrances and other specialty chemicals. Mr. Manning previously served as Chairman and Chief Executive Officer of Sensient from 1996 until February 2014. At Sensient, he was the architect of that company's strategic moves overseas and the transformation of the company from a producer of yeast and other commodities into a producer of flavor, fragrance and colors for foods, beverages, cosmetics and pharmaceuticals. Sensient also manufactures color, ink and other specialty chemicals for inkjet inks, display imaging systems and other applications. Sensient now has over 70 locations in more than 30 countries. Mr. Manning is also a director of Sensient. Mr. Manning is expected to retire from the Sensient board on April 21, 2016. Previously, Mr. Manning was a director of Badger Meter, Inc., a manufacturer of flow measurement and control products. In all, Mr. Manning has been a director of five different public companies.

Mr. Manning received his bachelor of science degree in mechanical engineering from Rensselaer Polytechnic Institute and his master of business administration degree from American University in operations research. He also has honorary doctor's degrees from Cardinal Stritch University and Marian University. Prior to joining Sensient, Mr. Manning worked for W. R. Grace, where he held various executive positions including: Assistant to the CEO, Vice President of Operations—European Division, President of the Educational Products Division, President of Real Estate Division, Vice President—Corporate Technical Group and President and CEO of the Ambrosia Chocolate Division. Mr. Manning retired from the United States Naval Reserve as an Aerospace Engineering Duty Officer with the rank of Rear Admiral. He served on active duty in the United States Navy from 1963 to 1967 and, during his tenure in the Reserve, was the Commanding Officer of four different commands. His last assignment was Director of the Naval Reserve Air System Program. His military awards include the Legion of Merit. Mr. Manning is a member of the American Society of Mechanical Engineers and the American Chemical Society, Navy League, the United States Naval Institute, the Naval Reserve Association, and the National Maritime Historic Association. He is also a Knight of Malta. Mr. Manning has extensive executive experience in international business, specialty chemicals and the food and beverage industry, with 18 years as a CEO and an additional six years as a COO.

**Defendant Marino**

63.     Defendant William J. Marino ("Marino") served as a Company director from 2002 to 2018 and served as Chairman of the Board from 2014 to 2018.

64.     For the fiscal year ended December 31, 2017, Defendant Marino received $380,010 in compensation.  This included $190,000 in fees earned or paid in cash, and $190,010 in stock awards.

65.     The Company's 2017 Proxy Statement stated the following about Defendant Marino:

Mr. Marino is the retired Chairman, President and Chief Executive Officer of Horizon Blue Cross Blue Shield of New Jersey or BCBSNJ, the state's largest health insurer, providing coverage for over 3.6 million people.

Mr. Marino joined Horizon BCBSNJ as Senior Vice President of Health Industry Services in January 1992, responsible for all aspects of Managed Care operations in New Jersey, as well as Market Research, Product Development, Provider Relations and Health Care Management. He became President and CEO in January 1994 and Chairman effective January 2010.

Since November 2010, Mr. Marino has served as a director of Sun Bancorp, Inc., where he serves on the Executive Committee, chairs the nominating and corporate governance committee and is a member of the compensation committee. Mr. Marino also serves as a director of WebMD Health Corp., where he is a member of the audit committee. Mr. Marino also serves as a director or trustee for numerous New Jersey-based cultural and community organizations.

Mr. Marino has over 40 years of experience in the health and employee benefits field, primarily in managed care, marketing and management. Before joining Horizon BCBSNJ, he was Vice President of Regional Group Operations for New York and Connecticut for Prudential, capping a 23-year career with the company.

Mr. Marino has extensive experience in the areas of management and strategic planning and board governance, as evidenced by his career at Horizon BCBSNJ and corporate boards. The breadth of his involvement in many corporate and community organizations has given him knowledge of corporate governance processes and practices and organizational structure optimization. Mr. Marino has been recognized with various awards over the years. He is the recipient of the New Jersey State Chamber 2015 Business Leadership Award. In 2007 he received The American Conference on Diversity's Humanitarian of the Year Award. Mr. Marino is also a recipient of the 1997 Ellis Island Medal of Honor. He graduated from St. Peter's College in Jersey City with a Bachelor of Science degree in Economics.

### **Defendant Wambold**

66.    Defendant Richard L. Wambold ("Wambold") served as a Company director from 2012 to 2019. According to the 2019 Proxy Statement, as of March 18, 2019, Defendant Wambold beneficially owned 25,549 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 18, 2019 was $45.29, Defendant Wambold owned approximately $1.2 million worth of Sealed Air stock.

67.    For the fiscal year ended December 31, 2018, Defendant Wambold received $215,040 in compensation from the Company. This included $10,000 in fees earned or paid in cash and $205,040 in stock awards.

68.    The Company's 2018 Proxy Statement stated the following about Defendant Wambold:

Mr. Wambold joined the Board of Directors of Sealed Air in March 2012. Mr. Wambold previously served as CEO of Reynolds/Pactiv Foodservice and

Consumer Products, a global manufacturer and supplier of consumer food and beverage packaging and consumer products, from November 2010 until January 2011 when he retired. Mr. Wambold was CEO of Pactiv from November 1999 until November 2010 and was CEO and Chairman of the Board from 2000 until November 2010. Mr. Wambold has been a private investor since January 2011. Mr. Wambold served as a director of Cooper Tire & Rubber Company from 2003 until his retirement from the board in May 2015. Mr. Wambold joined the board of Precision Castparts Corp in 2009. He served as lead director there until its sale to Berkshire Hathaway at the end of 2015.

Mr. Wambold holds a bachelor of arts degree in Government and a master of business administration from the University of Texas. Mr. Wambold's education, board member experience, business management experience, including his service as a public company chairman and CEO, and knowledge of the packaging industry make him a valuable member of the Board.

**Defendant Whitaker**

69.     Defendant Jerry R. Whitaker has served as Chairman of the Board since May 2018 and has served as a Company director since 2012. Defendant Whitaker is an Ex-Officio, non-voting Member of the Audit, Nominating and Corporate Governance, and Organization and Compensation Committees.  According to the 2019 Proxy Statement, as of March 18, 2019, Defendant Whitaker beneficially owned 8,021 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 18, 2019 was $45.29, Defendant Whitaker owned approximately $363,271 worth of Sealed Air stock.

70.     For the fiscal year ended December 31, 2018, Defendant Whitaker received $344,290 in compensation from the Company. This included $160,250 in fees earned or paid in cash and $184,040 in stock awards.

71.     The Company's 2019 Proxy Statement stated the following about Defendant Whitaker:

Mr. Whitaker was elected to the Board of Directors in January 2012. Mr. Whitaker worked at Eaton Corporation, a global manufacturer of highly engineered products, as President of Electrical Sector-Americas, until his retirement in June 2011, as President of Power Components & Systems Group from 2004 through 2009, and in various other management positions from 1994 to 2004. Prior to joining Eaton Corporation, Mr. Whitaker spent 22 years with Westinghouse Electric Corp.

Mr. Whitaker serves as a director of Matthews International Corporation, where he is the chair of the nominating and corporate governance committee and as a member of the finance committee, and on the boards of three private companies, Crescent Electric Supply Co., Milliken & Company, and Universal Electric Co. Mr. Whitaker also serves on the consulting board of the Energy Innovation Center, as well as the advisory board for The Syracuse University School of Engineering.

Mr. Whitaker received a bachelor of science degree from Syracuse University and a master of business administration degree from George Washington University. Mr. Whitaker's extensive experience and knowledge as an executive in global manufacturing industries are valuable resources to Sealed Air.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

72.     By reason of their positions as officers and/or directors of Sealed Air and because of their ability to control the business and corporate affairs of Sealed Air, the Individual Defendants owed Sealed Air and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Sealed Air in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Sealed Air and its shareholders so as to benefit all shareholders equally.

73.     Each director and officer of the Company owes to Sealed Air and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

74.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Sealed Air, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

75.     To discharge their duties, the officers and directors of Sealed Air were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

76.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Sealed Air, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Sealed Air's Board at all relevant times.

77.     As senior executive officers and directors of a publicly-traded company whose common stock is registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

78.     To discharge their duties, the officers and directors of Sealed Air were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal

controls of the Company. By virtue of such duties, the officers and directors of Sealed Air were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Sealed Air's own Code of Conduct and Code of Ethics for Senior Financial Executives;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Sealed Air conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Sealed Air and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Sealed Air's operations would comply with all applicable laws and Sealed Air's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

79.     Each of the Individual Defendants further owed to Sealed Air and the shareholders the duty of loyalty requiring that each favor Sealed Air's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

80.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Sealed Air and were at all times acting within the course and scope of such agency.

81.     Because of their advisory, executive, managerial, and directorial positions with Sealed Air, each of the Individual Defendants had access to adverse, non-public information about the Company.

82.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Sealed Air.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

83.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

84.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of Sections 14(a), 10(b) and 20(a) of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

85.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, most of whom are or were directors of Sealed Air, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

86.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

87.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Sealed Air and was at all times acting within the course and scope of such agency.

## SEALED AIR'S CODE OF CONDUCT

88.    The Company's Code of Conduct states that it applies to "employees . . . [and] anyone who conducts business with Sealed Air or on its behalf, including but not limited to our directors [and] officers . . ."  The Code of Conduct goes on to state that Sealed Air, its employees, directors, and officers are "accountable for promoting an ethical culture where acting with integrity comes first."

89.    The Code of Conduct provides when an employee is not sure whether a decision aligns with the Code of Conduct, employees should ask the following questions: "Is it legal? Does it align with [Sealed Air's] values? Does it comply with our Code and other policies? Would I feel comfortable if others knew about it?"

90.    The Code of Conduct emphasizes shareholder loyalty, stating that Sealed Air "respect[s] our shareholders and the trust they put us in.  Everything we do and every decision we make should create value for our customers, our shareholders, and our communities."

91.    Under a section entitled "Our Business Records," the Code of Conduct further states that:

> Many people depend on our information to make important strategic decisions. Each of us has a responsibility to ensure the stringent standards, policies, and controls we have established with respect to our financial books and records are followed.  From disclosure requirements, to preparing a financial statement, or simply completing your timesheet, each record or document you prepare must be honest, accurate, complete, and comply with our policies and the law. Information cannot be falsified under any circumstances.

92.    Under the section "Insider Trading", the Code of Conduct provides reporting guidelines for suspected violations of insider trading.  In order to comply with insider trading laws, the Company states that employees should:

> Never buy, sell, recommend, or trade in securities while in possession of material inside information related to the issuer of those securities; and do not provide others (including your family and friends) with inside information so that they may trade.

93.     The Company also promulgates a "Code of Ethics for Senior Financial Executives" (the "Code of Ethics"), which states that it is applicable to certain of the Company's executive officers, including the Company's CEO and CFO. The Code of Ethics contains a section entitled "Disclosure Controls and Procedures" that states as follows:

> The federal securities laws and the regulations of the New York Stock Exchange impose disclosure requirements on the Company, including requiring the Company to file certain reports with the Securities and Exchange Commission and the New York Stock Exchange and make certain public disclosures. Such reports and disclosures must comply with all applicable legal and NYSE requirements. The Company has adopted certain disclosure controls and procedures in connection with its reporting and other public disclosures. Each Senior Financial Executive must strictly adhere to such controls and procedures. All Senior Financial Executives must ensure that such reports and disclosures are (i) full, fair, timely, factual, accurate and understandable and (ii) meet all legal and exchange requirements. These requirements apply to all public disclosures of material information about the Company, including written disclosures, oral statements, visual presentations, analyst and press conferences, and media and investor calls.

94.     The Code of Ethics also contains a section entitled "Conflicts of Interest" that states as follows:

> All Senior Financial Executives should be scrupulous in avoiding a conflict of interest with respect to the Company's interests. A "conflict of interest" exists whenever an individual's private or personal interests interfere or conflict in any way (or even appear to interfere or conflict) with the interests of the Company. A conflict of interest may arise when a Senior Financial Executive takes an action or has an interest that may make it difficult to perform his or her Company work objectively and effectively. A conflict of interest may also arise when a Senior Financial Executive or a member of his or her family receives improper personal benefits as a result of his or her position in the Company, whether received from the Company or a third party. Both Company guidelines and federal law prohibit loans to Senior Financial Executives who serve as officers of the Corporation.

> Conflicts of interest are prohibited as a matter of Company policy, unless approved under applicable guidelines established by the Board of Directors or a committee of the Board. Conflicts of interest may not always be obvious, so any question concerning a potential conflict of interest should be reviewed with higher levels of management or the Company's Law Department. Any such potential or actual conflict of interest must be disclosed to the Board, and the Senior Financial

Executive must comply with any measure that may be required by the Audit Committee or the Board in order to avoid or eliminate such conflict.

Any employee, officer or director of the Company who becomes aware of a conflict or potential conflict involving a Senior Financial Executive should bring it to the attention of the General Counsel of the Corporation or a member of the Audit Committee of the Board of Directors at the principal executive offices of the Corporation. If the concern requires confidentiality, including keeping identity anonymous, then this confidentiality will be protected, except to the extent necessary to conduct an effective investigation or as required under applicable law, regulation or legal proceedings.

95.     The Code of Ethics also contains a section entitled "Accounting Complaints" that states as follows:

The Company's policy is to comply with all applicable financial reporting and accounting regulations applicable to the Company. If a Senior Financial Executive or any other employee of the Company has concerns or complaints regarding questionable accounting or auditing matters involving the Company, then he or she is encouraged to submit those concerns or complaints (anonymously, confidentially or otherwise) to the Audit Committee of the Board. Such submissions may be directed to the attention of the Audit Committee, or to any director who is a member of the Audit Committee, at the principal executive offices of the Company. If the concern requires confidentiality, including keeping identity anonymous, then this confidentiality will be protected, except to the extent necessary to conduct an effective investigation or as required under applicable law, regulation or legal proceedings [sic]

96.     The Individual Defendants violated the Code of Conduct, and Defendants Doheny, Peribere, Stiehl, and Lowe violated the Code of Ethics by allowing the Company to engage in the scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of Sections 14(a), 10(b) and 20(a) of the Exchange Act. Moreover, two of the Individual Defendants violated the Code of Conduct by engaging in insider trading. Also in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, and comply with laws and regulations.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

97.    Sealed Air specializes in the development, manufacture, marketing, and distribution of packaging products, most notably its shrink wrap product, Cryovac, and shipping packaging product, Bubble Wrap. The Company also provides food packaging services and develops and manufactures packing for medical supplies and pharmaceuticals.

98.    In 1998, Sealed Air acquired W.R. Grace's Cryovac packing business.  At the time of the acquisition, W.R. Grace was facing multiple asbestos lawsuits.  Pursuant to the terms of the Cryovac acquisition, W.R. Grace and its subsidiaries retained all liabilities arising out of their businesses, including asbestos-related liabilities, and agreed to indemnify Sealed Air for these liabilities.  Any liabilities related to Cryovac were assumed by the Company.

99.    Two years later, in 2000, Sealed Air was named a defendant in several lawsuits alleging that the acquisition was a fraudulent transfer in an effort by W.R. Grace to divest itself of assets and thereby avoid paying any judgment in the asbestos lawsuits.  The lawsuits against Sealed Air alleged that the Company, pursuant to a theory of successor liability, should be held liable for the asbestos litigation against W.R. Grace.  In 2001, W.R. Grace and several of its subsidiaries filed for bankruptcy in the U.S. Bankruptcy Court for the District of Delaware, and the asbestos litigation was stayed.

100.    In 2002, Sealed Air settled the lawsuits filed against it alleging successor liability, with Sealed Air agreeing to contribute to the settlement of the W.R. Grace asbestos litigation.

101.    After years-long litigation, the parties executed the Settlement in 2005 to resolve the asbestos litigation.  In 2014, W.R. Grace finally emerged from bankruptcy, and Sealed Air paid

$930 million and 18 million shares of Sealed Air stock into trusts that were set up to settle the asbestos claims.

102.    The Company recorded a $1.49 billion income tax deduction related to the Settlement.  The Company claimed a net operating loss on its 2014 U.S. tax return and carried back the loss ten years, to offset any profits in the ten prior years.  The Company also claimed an approximately $250 million tax refund and a $275 million deferred tax asset to offset future tax liabilities.

103.    In its Form 10-K filed with the SEC on February 22, 2016 (the "2015 10-K"), Sealed Air disclosed that the IRS had disallowed the $1.49 billion tax deduction on the grounds that the deduction was improper.  Sealed Air stated that it would protest the IRS's finding on the basis that it has "meritorious defenses for the deduction of the payments made pursuant to the Settlement agreement."  The Company's tax controversy with the IRS is still ongoing as of this date.

104.    In November 2014, as the Company was reconciling the improper $1.49 billion tax deduction for accounting purposes, Sealed Air abruptly terminated KPMG as its auditor, replacing the firm with EY.

**False and Misleading Statements**

***November 5, 2014 Form 10-Q***

105.    On November 5, 2014, Sealed Air filed with the SEC its quarterly report on Form 10-Q for the quarter ended September 30, 2014 (the "3Q 2014 10-Q").  The 3Q 2014 10-Q was signed by Defendant Stiehl.   Attached to the 3Q 2014 10-Q were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Peribere and Lowe attesting to the accuracy of the 2014 10-K.  The 3Q 2014

10-Q stated that the Company had $59.3 million in net earnings for the quarter. The 3Q 2014 10-Q also stated in pertinent part:

> Our largest deferred tax asset relates to the funding of the Settlement agreement. Our tax benefit with respect thereto depends upon our ability to efficiently utilize our deduction from funding the Settlement agreement, including our ability to generate future taxable income in the U.S. In addition, changes in statutory tax rates or other new legislation or regulation may change our deferred tax assets or liability balances, with either favorable or unfavorable impacts on our ETR [effective tax rate]. As discussed above, we funded the Settlement agreement on February 3, 2014 and we intend to deduct this payment in our 2014 consolidated U.S. income tax return. As a result, we expect to incur a net operating loss for U.S. tax purposes in 2014 and intend to carry back a significant portion of this loss. We have classified the resulting anticipated tax refund of approximately $200 million as a current income tax receivable, included in other receivables on the condensed consolidated balance sheet at September 30, 2014.

### November 14, 2014 Form 8-K

106.    On November 14, 2014, Sealed Air filed a current report with the SEC on Form 8-K (the "November 14, 2014 8-K").  The November 14, 2014 8-K disclosed that the Company had replaced KPMG with EY as its auditor, stating in relevant part:

> On November 11, 2014, the Audit Committee of the Board of Directors (the "Audit Committee") of Sealed Air Corporation ("Sealed Air" or the "Company") approved the selection of Ernst & Young LLP ("EY") to serve as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2015 following a competitive search process. The competitive search process involved several international registered public accounting firms. The Company's current independent registered public accounting firm, KPMG LLP ("KPMG"), was notified on November 11, 2014, that it will not be retained as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2015. KPMG's engagement as the Company's independent registered public accounting firm to audit the Company's consolidated financial statements for the fiscal year ending December 31, 2014, and the effectiveness of internal control over financial reporting as of December 31, 2014, is unaffected by the selection of EY, as KPMG's dismissal will become effective upon the completion of KPMG's audit of the Company's consolidated financial statements as of and for the fiscal year ended December 31, 2014 and the filing of the related Annual Report on Form 10-K.

*   *   *

On November 11, 2014, the Audit Committee approved the selection of EY to serve as Sealed Air's independent registered public accounting firm for the fiscal year ending December 31, 2015. During the fiscal years ended December 31, 2013 and 2012, and the subsequent interim period through November 11, 2014, neither Sealed Air nor anyone on its behalf has consulted with EY, regarding either (i) the application of accounting principles to a specified transaction, either completed or proposed, or the type of audit opinion that might be rendered on Sealed Air's consolidated financial statements, in any case where a written report or oral advice was provided to Sealed Air that EY concluded was an important factor considered by Sealed Air in reaching a decision as to the accounting, auditing or financial reporting issue; or (ii) any matter that was either the subject of a "disagreement," as that term is defined in Item 304(a)(1)(iv) of Regulation S-K and the related instructions to Item 304 of Regulation S-K, or a "reportable event," as that term is defined in Item 304(a)(1)(v) of Regulation S-K.

### *February 10, 2015 Press Release*

107.    On February 10, 2015, the Company issued a press release disclosing its financial results for fourth quarter 2014 and the fiscal year ended December 31, 2014 (the "February 10, 2015 Press Release").  The February 10, 2015 Press Release announced that Sealed Air had realized $66.3 million in net earnings for the quarter.  The February 10, 2015 Press Release stated in relevant part:

> Cash flow used in operating activities in 2014 was $202 million, which includes the $930 million payment in February 2014 pursuant to the Settlement agreement and an excess tax benefit of $38 million related to the 18 million shares of Common Stock issued pursuant to the Settlement agreement. Excluding the Settlement agreement payment and excess tax benefit, cash flow provided by operating activities was $766 million, which is net of $108 million of restructuring and $21 million of SARs payments. This compares with cash provided by operating activities of $625 million in 2013, which is net of $107 million of restructuring and $46 million of SARs [stock appreciation rights] payments. Capital expenditures were $154 million in the full year 2014 compared to $116 million in the full year 2013.

### *2015 10-K*

108.    On February 27, 2015 the Company filed its annual report with the SEC for the 2014 fiscal year on a Form 10-K (the "2014 10-K").  The 2014 10-K was signed by Defendants Peribere, Lowe, Stiehl, Chu, Codey, Duff, Kosecoff, Manning, Marino, Wambold, and Whitaker.

Attached to the 2014 10-K were SOX certifications signed by Defendants Peribere and Lowe attesting to the accuracy of the 2014 10-K.  The 2014 10-K contained the same financials as in the February 10, 2015 Press Release, and additionally stated:

> We are deducting the payment mentioned above in our 2014 consolidated U.S. income tax return. As a result, we have a net operating loss for U.S. tax purposes in 2014 and are carrying back, for 10 years, more than $1 billion of the loss. Tax benefits resulting from the Settlement agreement were recorded as a $247 million income tax receivable (including $38 million of additional paid in capital related to shares of Common Stock issued pursuant to the Settlement agreement) and net deferred tax assets of $144 million for U.S. federal net operating losses and $31million for state net operating loss carry forwards. The increase to additional paid-in capital on our consolidated balance sheet had no impact to our consolidated statements of operations.

> *   *   *

> In the fourth quarter of 2013, we recorded an increase to the valuation allowance on our net deferred tax asset related to the Settlement agreement, which resulted in an increase of approximately $50 million to our income tax provision (approximately $0.23 per diluted share).

### *April 2, 2015 Proxy Statement*

109.    On April 2, 2015, the Company filed a Schedule 14A with the SEC (the "2015 Proxy Statement").  Defendants Chu, Codey, Duff, Kosecoff, Lustig, Manning, Marino, Peribere, Wambold, and Whitaker, solicited the 2015 proxy, which contained material misstatements and omissions.

110.    The 2015 Proxy stated as follows with regard to the appointment of EY as auditor:

> On November 11, 2014, following a competitive search process, the Audit Committee selected Ernst & Young LLP ("EY") to be engaged as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2015. The competitive search process involved several international registered public accounting firms. The Company's current independent registered public accounting firm, KPMG LLP ("KPMG"), was notified on November 11, 2014, that it would not be retained as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2015. KPMG's engagement as the Company's independent registered public accounting firm to audit the Company's consolidated financial statements for the fiscal year ending December 31, 2014, and

the effectiveness of internal control over financial reporting as of December 31, 2014, was unaffected by the selection of EY, as KPMG's dismissal became effective upon the completion of KPMG's audit of the Company's consolidated financial statements as of and for the fiscal year ended December 31, 2014 and the filing of the related Annual Report on Form 10-K. A representative of KPMG is not expected to be present at the Annual Meeting.

*   *   *

On February 16, 2015, the Audit Committee approved the engagement of EY as our independent registered public accounting firm to examine and report on the Company's consolidated financial statements and the effectiveness of the Company's internal control over financial reporting for the fiscal year ending December 31, 2015, subject to ratification of the retention by the stockholders at the Annual Meeting. Following a comprehensive request for proposal process, the Audit Committee considered EY to be well qualified. In the absence of contrary specification, the Proxy Committee will vote proxies received in response to this solicitation in favor of ratification of the appointment. If the Company's stockholders fail to ratify the selection of EY as the independent registered accounting firm for 2015, the Audit Committee will reconsider whether to retain EY. Even if the proposal is approved, the Audit Committee may, in its discretion, appoint a different independent registered public accounting firm at any time during the year.

On March 2, 2015, EY was engaged to serve as Sealed Air's independent registered public accounting firm for the fiscal year ending December 31, 2015. During the fiscal years ended December 31, 2014 and 2013, and the subsequent interim period through March 2, 2015, neither Sealed Air nor anyone on its behalf has consulted with EY, regarding either (i) the application of accounting principles to a specified transaction, either completed or proposed, or the type of audit opinion that might be rendered on Sealed Air's consolidated financial statements, in any case where a written report or oral advice was provided to Sealed Air that EY concluded was an important factor considered by Sealed Air in reaching a decision as to the accounting, auditing or financial reporting issue; or (ii) any matter that was either the subject of a "disagreement," as that term is defined in Item 304(a)(1)(iv) of Regulation S-K and the related instructions to Item 304 of Regulation S-K, or a "reportable event," as that term is defined in Item 304(a)(1)(v) of Regulation S-K. 111.

112.     The 2015 Proxy Statement also failed to disclose *inter alia*, that: (1) the Company's $1.49 billion deduction pursuant to the Settlement was improper and undertaken for the sole purpose of artificially inflating the Company's financials and stock price; (2) the Company had appointed EY as its auditor as the result of a flawed and conflicted process and for the sole purpose

of colluding in the improper tax deduction and related accounting; (3) the Company's earnings, cash flows, and operating income were overstated during the Relevant Period; (4) as a result of the foregoing, the Company's financial statements were materially false and misleading and violated the tenets of GAAP; and (5) the Company failed to maintain internal controls.

***April 30, 2015 Press Release***

113.    The Company issued a press release on April 30, 2015 (the "April 30, 2015 Press Release") disclosing its financials for the quarter ended March 31, 2015.  The April 30, 2015 Press Release indicated that the Company had realized $97.2 million in net earnings for the quarter, and further stated:

> Cash flow provided by operating activities in the first three months ending 2015 was $319 million. In March 2015, the Company received a tax refund of $235 million related to the Settlement agreement payment. Excluding the tax refund, cash flow provided by operating activities in the first three months ending 2015 was $84 million, which is net of $22 million of restructuring and $4 million of SARs payments. This compares with cash used by operating activities of $3 million in the first three months ending 2014, which is net of $27 million of restructuring and $14 million of SARs payments and $930 million related to the Settlement agreement. Capital expenditures were $21 million in the first three months ending 2015 compared to $28 million in the first three months ending 2014.

***May 5, 2015 Form 10-Q***

114.    On May 5, 2015, the Company filed with the SEC its quarterly report on Form 10-Q for the quarter ended March 31, 2015 (the "1Q 2015 10-Q").  The 1Q 2015 10-Q was signed by Defendant Stiehl.   Attached to the 1Q 2015 10-Q were SOX certifications signed by Defendants Peribere and Lowe attesting to the accuracy of the 1Q 2015 10-Q.  The 1Q 2015 10-

Q contained the same financials as those contained in the April 30, 2015 Press Release.  The 1Q

2015 10-Q additionally stated:

**Three Months Ended March 31, 2015**

Net cash provided by operating activities of $319 million in 2015 was primarily
attributable to:

• $235 million tax refund related to the Settlement agreement payment;

• $100 million of non-cash adjustments to reconcile net earnings to net cash
provided by operating activities, including adjustments for depreciation and
amortization and share-based incentive compensation expenses; and

• $97 million of net earnings.

### *July 30, 2015 Press Release*

115.    The Company issued a press release on July 30, 2015 (the "July 30, 2015 Press

Release") disclosing its financials for the quarter ended June 30, 2015.  The July 30, 2015 Press

Release stated that Sealed Air had realized $28 million in net earnings for the quarter, and stated

further in relevant part:

Cash flow provided by operating activities in the six months ended June 30, 2015
was $463 million. In March 2015, the Company received a tax refund of $235
million related to the Settlement agreement (as defined in the Company's Form 10-
K for the year ended December 31, 2014) payment. Excluding the tax refund, cash
flow provided by operating activities in the six months ended June 30, 2015 was
$228 million, which is net of $45 million of restructuring and $18 million of SARs
payments. This compares with cash used by operating activities of $756 million in
the six months ended 2014, which is net of $50 million of restructuring, $17 million
of SARs payments and $930 million related to the Settlement agreement. Capital
expenditures were $58 million in the six months ended June 30, 2015 compared to
$55 million in the six months ended June 30, 2014.

### *August 4, 2015 10-Q*

116.    On August 4, 2015, the Company filed with the SEC its quarterly report on Form

10-Q for the quarter ended June 30, 2015 (the "2Q 2015 10-Q").  The 2Q 2015 10-Q was signed

by Defendant Stiehl.  Attached to the 2Q 2015 10-Q were SOX certifications signed by Defendants

Peribere and Lowe attesting to the accuracy of the 2Q 2015 10-Q.  The 2Q 2015 10-Q contained the same financials previously disclosed in the July 30, 2015 Press Release, and additionally stated in relevant part:

> **Six Months Ended June 30, 2015**
>
> Net cash provided by operating activities of $463 million in the first half of 2015 was primarily attributable to:
>
> • $125 million of net earnings, which included $277 million of non-cash adjustments to reconcile net earnings to net cash provided by operating activities, including adjustments for depreciation and amortization and sharebased incentive compensation expenses; and
>
> • $235 million tax refund related to the Settlement agreement payment.

### *The October 27, 2015 Press Release*

117.     On October 27, 2015, the Company issued a press release (the "October 27, 2015 Press Release") announcing its financials for the quarter ended September 30, 2015.  The October 27, 2015 Press Release disclosed that the Company realized $87 million in net earnings for the quarter, additionally stating in relevant part:

> Cash flow provided by operating activities in the nine months ended September 30, 2015 was $679 million. In March 2015, the Company received a tax refund of $235 million related to the payment of funds in connection with the Settlement agreement (as defined in the Company's Annual Report on Form 10-K for the year ended December 31, 2014). Excluding the tax refund, cash flow provided by operating activities in the nine months ended September 30, 2015 was $444 million, which is net of $72 million of restructuring and $20 million of SARs payments. This compares with cash used by operating activities of $465 million in the nine months ended 2014, which is net of $76 million of restructuring, $18 million of SARs payments and $930 million related to the Settlement agreement. Capital expenditures were $112 million in the nine months ended September 30, 2015 compared to $94 million in the nine months ended September 30, 2014.

### *November 3, 2015 10-Q*

118.     On November 3, 2015, the Company filed with the SEC its quarterly report on Form 10-Q for the quarter ended September 30, 2015 (the "3Q 2015 10-Q").  The 3Q 2015 10-Q was

signed by Defendant Stiehl.   Attached to the 3Q 2015 10-Q were SOX certifications signed by

Defendants Peribere and Lowe attesting to the accuracy of the 3Q 2015 10-Q.  The 3Q 2015 10-Q

contained the same financials as contained in the October 27, 2015 Press Release, and additionally

stated in relevant part:

**Nine Months Ended September 30, 2015**

Net cash provided by operating activities of $679 million in the nine months
ended September 30, 2015 was primarily attributable to:

• $212 million of net earnings, which included $336 million of non-cash
adjustments to reconcile net earnings to net cash provided by operating activities,
including adjustments for depreciation and amortization and sharebased incentive
compensation expenses; and

• $235 million tax refund related to the Settlement agreement payment.

***February 10, 2016 Press Release***

119.     On February 10, 2016, the Company issued a press release (the "February 10, 2016

Press Release") disclosing its financial results for the quarter and year ended December 31, 2015.

According to the February 10, 2016 Press Release, Sealed Air realized $124 million in net earnings

for the quarter.  The February 10, 2016 Press Release further stated in relevant part:

Cash flow provided by operating activities in 2015 was $968 million. In March
2015, the Company received a tax refund of $235 million related to the payment of
funds in connection with the Settlement agreement. Excluding the tax refund, cash
flow provided by operating activities in 2015 was $733 million, which is net of $98
million of restructuring and $21 million of SARs payments. This compares with
cash used by operating activities of $215 million in 2014, which is net of $108
million of restructuring, $21 million of SARs payments and $930 million related to
the Settlement agreement. Capital expenditures were $184 million in the full year
2015 compared to $154 million in 2014.

### The Truth Begins to Emerge While False and Misleading Statements Continue

*2015 Form 10-K*

120.    On February 22, 2016 the Company filed its annual report with the SEC for the 2015 fiscal year on a Form 10-K (the "2015 10-K").  The 2015 10-K was signed by Defendants Peribere, Lowe, Stiehl, Chu, Codey, Duff, Kosecoff, Lustig, Manning, Marino, Wambold, and Whitaker.  Attached to the 2015 10-K were SOX certifications signed by Defendants Peribere and Lowe attesting to the accuracy of the 2015 10-K.  The 2015 10-K contained the same financial information as in the February 10, 2016 Press Release, additionally stating in relevant part:

> We deducted the Settlement payment in our 2014 consolidated U.S. income tax return. As a result, we had a net operating loss for U.S. tax purposes in 2014 and carried back, for 10 years, more than $1 billion of the loss.

> We increased our unrecognized tax benefits by $104 million in 2015, for the recording of a reserve related to the Settlement payment. While the Company believes it is more likely than not it will be successful, the ultimate outcome of negotiations may affect the utilization of certain tax attributes and require us to return all or a portion of the refund.

> In the fourth quarter of 2013, we recorded an increase to the valuation allowance on our net deferred tax asset related to the Settlement agreement, which resulted in an increase of approximately $50 million to our income tax provision (approximately $0.23 per diluted share).

> * * *

> Net cash provided by operating activities from continuing operations of $968 million in 2015 was primarily attributable to:

> • $335 million of net earnings, which included $355 million of non-cash adjustments to reconcile net earnings to cash provided by operating activities, including adjustments for depreciation and amortization of $213 million, share-based incentive compensation expense of $61 million, profit sharing expense of $36 million, a loss on debt redemption of $110 million, partially offset by $46 million of excess tax benefit related to the 18 million shares of our common stock issued pursuant to the Settlement agreement and $13 million of excess tax benefit related to stock-based compensation.

> • $235 million tax refund related to the Settlement agreement payment; and

• $43 million of changes in operating assets and liabilities, primarily reflecting an increase in accounts payable and trade receivables partially offset by a decrease in inventory and other assets and liabilities. This activity reflects the timing of inventory purchases and the related payments of cash along with the timing of certain annual incentive compensation payments and interest payments and the seasonality of sales and collections.

\* \* \*

Net cash used in operating activities from continuing operations in 2014 of $215 million was primarily attributable to

• $930 million used to fund the cash portion of the Settlement agreement;

• $38 million of excess tax benefit related to the 18 million share[s] of our common stock issued pursuant to the Settlement agreement; and

• $153 million of changes in operating assets and liabilities, primarily reflecting an increase in income tax receivables related to the Settlement agreement, as well as an increase in inventories, partially offset by an increase in accounts payable. This activity reflects the timing of inventory purchases and the related payments of cash along with the timing of certain annual incentive compensation payments and interest payments and the seasonality of sales and collections.

121.     The 2015 10-K also disclosed that the IRS intended to disallow the $1.49 billion

deduction the Company took with respect to the Settlement.  The Company stated that it "strongly

disagree[d]" and further stated it had "meritorious defenses for the deduction of the payments."

### April 8, 2016 Proxy Statement

122.     On April 8, 2016, the Company filed a Schedule 14A with the SEC (the "2016

Proxy Statement").  Defendants Chu, Codey, Duff, Kosecoff, Lustig, Manning, Marino, Peribere,

Wambold, and Whitaker, solicited the 2016 proxy, which contained material misstatements and

omissions.

123.     The 2016 Proxy stated as follows with regard to the appointment of EY as auditor:

The Audit Committee has approved the retention of Ernst & Young LLP ("EY"), an Independent Registered Public Accounting Firm, as our independent registered

public accounting firm to examine and report on the Company's consolidated financial statements and the effectiveness of the Company's internal control over financial reporting for the fiscal year ending December 31, 2016, subject to ratification of the retention by the stockholders at the Annual Meeting. The Audit Committee considers EY to be well qualified. In the absence of contrary specification, the Proxy Committee will vote proxies received in response to this solicitation in favor of ratification of the appointment. Even if the proposal is approved, the Audit Committee may, in its discretion, appoint a different independent registered public accounting firm at any time during the year.

KPMG LLP ("KPMG") was the Company's independent registered public accounting firm until March 2, 2015, when, following approval by the Audit Committee, EY was engaged as the Company's independent registered public accounting firm to examine and report on the Company's consolidated financial statements and the effectiveness of the Company's internal control over financial reporting for the fiscal year ended December 31, 2015.

During the fiscal years ended December 31, 2014 and 2013, and the subsequent interim period through March 2, 2015, neither Sealed Air nor anyone on its behalf has consulted with EY, regarding either (i) the application of accounting principles to a specified transaction, either completed or proposed, or the type of audit opinion that might be rendered on Sealed Air's consolidated financial statements, in any case where a written report or oral advice was provided to Sealed Air that EY concluded was an important factor considered by Sealed Air in reaching a decision as to the accounting, auditing or financial reporting issue; or (ii) any matter that was either the subject of a "disagreement," as that term is defined in Item 304(a)(1)(iv) of Regulation S-K and the related instructions to Item 304 of Regulation S-K, or a "reportable event," as that term is defined in Item 304(a)(1)(v) of Regulation S-K.

124.   The 2016 Proxy Statement also failed to disclose *inter alia*, that: (1) the Company's $1.49 billion deduction pursuant to the Settlement was improper and undertaken for the sole purpose of artificially inflating the Company's financials and stock price; (2) the Company had appointed EY as its auditor as the result of a flawed and conflicted process and for the sole purpose of colluding in the improper tax deduction and related accounting; (3) the Company's earnings, cash flows, and operating income were overstated during the Relevant Period; (4) as a result of the foregoing, the Company's financial statements were materially false and misleading and violated the tenets of GAAP; and (5) the Company failed to maintain internal controls.

*May 2, 2016 10-Q*

125.     On May 2, 2016, the Company filed with the SEC its quarterly report on Form 10-Q for the quarter ended March 31, 2016 (the "1Q 2016 10-Q").  The 1Q 2016 10-Q was signed by Defendant Stiehl.  Attached to the 1Q 2016 10-Q were SOX certifications signed by Defendants Peribere and Lowe attesting to the accuracy of the 1Q 2016 10-Q.  The 1Q 2016 10-Q reiterated the financial information related to the Settlement as contained in the 1Q 2015 10-Q, and further stated:  "The [IRS] is currently auditing the 2011 consolidated U.S. federal income tax returns of legacy Sealed Air and the 2012-2014 consolidated U.S. federal income tax return of the Company. Included in the audit of the 2014 tax return is the examination by the IRS with respect to the Settlement agreement deduction in 2014.  The outcome of the examination may affect the utilization of certain tax attributes and require us to return a portion of the refund."

### August 1, 2016 10-Q

126.     On August 1, 2016, the Company filed with the SEC its quarterly report on Form 10-Q for the quarter ended June 31, 2016 (the "2Q 2016 10-Q").  The 2Q 2016 10-Q was signed by Defendant Stiehl.  Attached to the 2Q 2016 10-Q were SOX certifications signed by Defendants Peribere and Lowe attesting to the accuracy of the 2Q 2016 10-Q.  The 2Q 2016 10-Q reiterated the financial information related to the Settlement as contained in the 2Q 2015 10-Q, and further stated:    The 2Q 2016 10-Q further reiterated, "The [IRS]  is currently auditing the 2011 consolidated U.S. federal income tax return of legacy Sealed Air and the 2012-2014 consolidated U.S. federal income tax return of the Company. Included in the audit of the 2014 tax return is the examination by the [IRS] with respect to the Settlement agreement deduction in 2014.  The outcome of the examination may affect the utilization of certain tax attributes and require us to return a portion of the refund."

### October 31, 2016 10-Q

127.    On October 31, 2016, the Company filed with the SEC its quarterly report on Form 10-Q for the quarter ended September 30, 2016 (the "3Q 2016 10-Q").  The 3Q 2016 10-Q was signed by Defendant Stiehl.   Attached to the 3Q 2016 10-Q were SOX certifications signed by Defendants Peribere and Lowe attesting to the accuracy of the 3Q 2016 10-Q.  The 3Q 2016 10-Q reiterated that:  "The following are important factors that we believe could cause actual results to differ materially from those in our forward-looking statements: the tax benefits associated with the Settlement agreement (as defined in our Annual Report on Form 10-K for the year ended December 31, 2015) . . ."

*2016 10-K*

128.    On February 15, 2017, the Company filed with the SEC its annual report on Form 10-K for the Year ended December 31, 2016 (the "2016 10-K").  The 2016 10-K was signed by Defendants Peribere, Lowe, Stiehl, Chu, Codey, Duff, Kosecoff, Lustig, Manning, Marino, Wambold, and Whitaker.   Attached to the 2016 10-K were SOX certifications signed by Defendants Peribere and Lowe attesting to the accuracy of the 2016 10-K.  The 2016 10-K reiterated that:

> *The U.S. Internal Revenue Service (the "IRS") has indicated that it intends to disallow our deduction of the approximately $1.49 billion for the payments made pursuant to the Settlement agreement***[.]**

(Emphasis in original.)

129.    The 2016 10-K reiterated that the Company had "meritorious defenses" with respect to the $1.49 billion deduction pursuant to the Settlement.

130.    The 2016 10-K reiterated:  "The following are important factors that we believe could cause actual results to differ materially from those in our forward-looking statements: the

tax benefits associated with the Settlement agreement (as defined in our Annual Report on Form

10-K for the year ended December 31, 2015) . . ."

> We increased our unrecognized tax benefits by $104 million in 2015, for the recording of a reserve related to the Settlement payment. While the Company believes it is more likely than not it will be successful, the ultimate outcome of negotiations may affect the utilization of certain tax attributes and require us to return all or a portion of the refund.

### April 6, 2017 Proxy Statement

131.    On April 6, 2017, the Company filed a Schedule 14A with the SEC (the "2017

Proxy Statement").  Defendants Chu, Codey, Duff, Keizer, Kosecoff, Lustig, Marino, Peribere,

Wambold, and Whitaker, solicited the 2017 proxy, which contained material misstatements and

omissions.[2]

132.    With respect to the Code of Ethics and Code of Conduct, the 2017 Proxy Statement

stated:

> We have a Code of Conduct applicable to all directors, officers and employees of Sealed Air and its subsidiaries. We also have a supplemental Code of Ethics for Senior Financial Executives that applies to our Chief Executive Officer, Chief Financial Officer, Controller, Treasurer and all other employees performing similar functions. We have posted the Code of Conduct and the Code of Ethics for Senior Financial Executives on our website at www.sealedair.com. We will post any amendments to the Code of Conduct and the Code of Ethics for Senior Financial Executives on our website. In accordance with the requirements of the SEC and the NYSE, we will also post waivers applicable to any of our officers or directors from provisions of the Code of Conduct or the Code of Ethics for Senior Financial Executives on our website. We have not granted any such waivers to date.

133.    The 2017 Proxy stated as follows with regard to the appointment of EY as auditor:

> The Audit Committee has approved the retention of Ernst & Young LLP ("EY"), an Independent Registered Public Accounting Firm, as our independent registered

---

[2] Plaintiff's allegations with respect to the misleading statements in the 2017 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

public accounting firm to examine and report on the Company's consolidated financial statements and the effectiveness of the Company's internal control over financial reporting for the fiscal year ending December 31, 2016, subject to ratification of the retention by the stockholders at the Annual Meeting. The Audit Committee considers EY to be well qualified. In the absence of contrary specification, the Proxy Committee will vote proxies received in response to this solicitation in favor of ratification of the appointment. Even if the proposal is approved, the Audit Committee may, in its discretion, appoint a different independent registered public accounting firm at any time during the year.

KPMG LLP ("KPMG") was the Company's independent registered public accounting firm until March 2, 2015, when, following approval by the Audit Committee, EY was engaged as the Company's independent registered public accounting firm to examine and report on the Company's consolidated financial statements and the effectiveness of the Company's internal control over financial reporting for the fiscal year ended December 31, 2015.

During the fiscal years ended December 31, 2014 and 2013, and the subsequent interim period through March 2, 2015, neither Sealed Air nor anyone on its behalf has consulted with EY, regarding either (i) the application of accounting principles to a specified transaction, either completed or proposed, or the type of audit opinion that might be rendered on Sealed Air's consolidated financial statements, in any case where a written report or oral advice was provided to Sealed Air that EY concluded was an important factor considered by Sealed Air in reaching a decision as to the accounting, auditing or financial reporting issue; or (ii) any matter that was either the subject of a "disagreement," as that term is defined in Item 304(a)(1)(iv) of Regulation S-K and the related instructions to Item 304 of Regulation S-K, or a "reportable event," as that term is defined in Item 304(a)(1)(v) of Regulation S-K.

134.    The 2017 Proxy Statement also called for shareholder ratification of the retention of EY as auditor.  The 2017 Proxy additionally called for an advisory vote to approve Sealed Air's executive compensation (the "2017 Executive Compensation") as disclosed in the 2017 Proxy Statement.

135.    The 2017 Proxy Statement was false and misleading because, despite assertions to the contrary, the Code of Conduct and Code of Ethics were not followed, as evidenced by the numerous false and misleading statements herein, and the Individual Defendants' failures to report violations of the Code of Conduct and Code of Ethics.

136.    The 2017 Proxy Statement also failed to disclose *inter alia*, that: (1) the Company's $1.49 billion deduction pursuant to the Settlement was improper and undertaken for the sole purpose of artificially inflating the Company's financials and stock price; (2) the Company had appointed EY as its auditor as the result of a flawed and conflicted process and for the sole purpose of colluding in the improper tax deduction and related accounting; (3) the Company's earnings, cash flows, and operating income were overstated during the Relevant Period; (4) as a result of the foregoing, the Company's financial statements were materially false and misleading and violated the tenets of GAAP; and (5) the Company failed to maintain internal controls.

137.    As a result of the material misstatements and omissions contained in the 2017 Proxy Statement, Company shareholders approved the appointment of EY as auditor.

### *May 10, 2017 10-Q*

138.    On May 10, 2017, the Company filed with the SEC its quarterly report on Form 10-Q for the quarter ended March 31, 2017 (the "1Q 2017 10-Q").  The 1Q 2017 10-Q was signed by Defendant Stiehl.   Attached to the 1Q 2017 10-Q were SOX certifications signed by Defendants Peribere and Lowe attesting to the accuracy of the 1Q 2017 10-Q.  The 1Q 2017 10-Q reiterated: "The following are important factors that we believe could cause actual results to differ materially from those in our forward-looking statements: the tax benefits associated with the Settlement agreement (as defined in our Annual Report on Form 10-K for the year ended December 31, 2016) . . ."  The 1Q 2017 10-Q further reiterated "The [IRS] is currently auditing the 2011 consolidated U.S. federal income tax return of legacy Sealed Air and the 2012-2014 consolidated U.S. federal income tax return of the Company.  Included in the audit of the 2014 return is the examination by the [IRS] with respect to the Settlement agreement deduction in 2014 and related carryback to

legacy Sealed Air tax years. The outcome of the examination may require us to return a portion of the refund."

### *August 9, 2017 10-Q*

139.     On August 9, 2017, the Company filed with the SEC its quarterly report on Form 10-Q for the quarter ended June 30, 2017 (the "2Q 2017 10-Q").  The 2Q 2017 10-Q was signed by Defendant Stiehl.   Attached to the 2Q 2017 10-Q were SOX certifications signed by Defendants Peribere and Lowe attesting to the accuracy of the 2Q 2017 10-Q.  The 2Q 2017 10-Q reiterated: "The following are important factors that we believe could cause actual results to differ materially from those in our forward-looking statements: the tax benefits associated with the Settlement agreement (as defined in our Annual Report on Form 10-K for the year ended December 31, 2016) . . ."

140.     The 2Q 2017 10-Q further reiterated: "Included in the audit of the 2014 return is the examination by the Service with respect to the Settlement agreement deduction in 2014 and related carryback to legacy Sealed Air tax years. The outcome of the examination may require us to return a portion of the refund."   The 2Q 2017 10-Q further reiterated that pursuant to the Company's 2016 10-K, the Company "increased our unrecognized tax benefits by $104.0 million in 2015, for the recording of a reserve related to the Settlement payment."

141.     The 2Q 2017 10-Q further stated "Although the disposition of [the Settlement payment], the Company believes that it has valid defenses [to the IRS disallowance], and strong arguments for the validity of the deductions, the ultimate outcome of negotiations may affect the utilization of certain tax attributes and require us to return all or a portion of the $235.2 million refund."

### *November 9, 2017 10-Q*

142.     On November 9, 2017, the Company filed with the SEC its quarterly report on Form 10-Q for the quarter ended September 30, 2017 (the "3Q 2017 10-Q").  The 3Q 2017 10-Q was signed by Defendant Stiehl.   Attached to the 1Q 2016 10-Q were SOX certifications signed by Defendants Peribere and Stiehl attesting to the accuracy of the 3Q 2017 10-Q.  The 3Q 2017 10-Q reiterated: "The following are important factors that we believe could cause actual results to differ materially from those in our forward-looking statements: the tax benefits associated with the Settlement agreement (as defined in our Annual Report on Form 10-K for the year ended December 31, 2016) . . ."

143.     The 3Q 2017 10-Q further stated "Included in the audit of the 2014 return is the examination by the [IRS] with respect to the Settlement agreement deduction in 2014 and related carryback to tax years 2004-2012. The outcome of the examination may require us to return a portion of the refund."  The 3Q 2017 10-Q reiterated that the Company ". . . increased [its] unrecognized tax benefits by $104.0 million in 2015, for the recording of a reserve related to the Settlement payment.  Although the disposition of this matter has not changed, the Company believes it has valid defenses, and strong arguments for the validity of the deductions, the ultimate outcome of negotiations may affect the utilization of certain tax attributes and require us to return all or a portion of the $235.2 million refund."

*2017 10-K*

144.     On February 21, 2018, the Company filed with the SEC its annual report on Form 10-K for the quarter ended December 31, 2017 (the "2017 10-K").  The 2017 10-K was signed by Defendants Doheny, Stiehl, Chu, Codey, Duff, Kosecoff, Lustig, Keizer, Marino, Wambold, and Whitaker.   Attached to the 2017 10-K were SOX certifications signed by Defendants Doheny and Stiehl attesting to the accuracy of the 2017 10-K.

145.    The 2017 10-K reiterated: "The following are important factors that we believe could cause actual results to differ materially from those in our forward-looking statements: global economic and political conditions . . . the tax benefit associated with the Settlement agreement . . ."

146.    The 2017 10-K further stated:

**The U.S. Internal Revenue Service (the "IRS") has indicated that it intends to disallow our deduction of the approximately $1.49 billion for the payments made pursuant to the Settlement agreement[.]**

(Emphasis in original.)

147.    The 2017 10-K reiterated that the Company has "meritorious defenses" to the IRS's disallowance of the $1.49 billion deduction.  The 2017 10-K further reiterated that "[t]he [IRS] is currently auditing the 2011-2014 U.S. federal income tax returns of the Company.  Included in the audit of the 2014 return is the examination by the [IRS] with respect to the Settlement agreement deduction and the related carryback to tax years 2004-2012. The outcome of the examination could affect the utilization of certain tax attributes and require us to make a significant payment."

*April 5, 2018 Proxy Statement*

148.    On April 5, 2018, the Company filed a Schedule 14A with the SEC (the "2018 Proxy Statement").  Defendants Chu, Codey, Duff, Keizer, Kosecoff, Lustig, Marino, Peribere, Wambold, and Whitaker, solicited the 2018 proxy, which contained material misstatements and omissions.[3]

---

[3] Plaintiff's allegations with respect to the misleading statements in the 2018 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

149.    With respect to the Code of Ethics and Code of Conduct, the 2018 Proxy Statement

stated:

> We have a Code of Conduct applicable to all directors, officers and employees of
> Sealed Air and its subsidiaries. We also have a supplemental Code of Ethics for
> Senior Financial Executives that applies to our Chief Executive Officer, Chief
> Financial Officer, Controller, Treasurer and all other employees performing similar
> functions. We have posted the Code of Conduct and the Code of Ethics for Senior
> Financial Executives on our website at www.sealedair.com. We will post any
> amendments to the Code of Conduct and the Code of Ethics for Senior Financial
> Executives on our website. In accordance with the requirements of the SEC and the
> NYSE, we will also post waivers applicable to any of our officers or directors from
> provisions of the Code of Conduct or the Code of Ethics for Senior Financial
> Executives on our website. We have not granted any such waivers to date.

150.    The 2018 Proxy stated as follows with regard to the retention of EY as auditor:

> The Audit Committee has approved the retention of Ernst & Young LLP, or EY,
> an Independent registered public accounting firm, as our independent auditor to
> examine and report on our consolidated financial statements and the effectiveness
> of our internal control over financial reporting for the fiscal year ending
> December 31, 2018. The Audit Committee considers EY to be well qualified. In
> the absence of contrary specification, the Proxy Committee will vote proxies
> received in response to this solicitation in favor of ratification of the appointment.
> Even if the proposal is approved, the Audit Committee may, in its discretion,
> appoint a different independent registered public accounting firm to serve as
> independent auditor at any time during the year.

151.    The 2018 Proxy Statement also called for shareholder ratification of the retention

of EY as auditor for 2018.  The 2018 Proxy additionally called for an advisory vote to approve

Sealed Air's executive compensation as disclosed in the 2018 Proxy Statement, and a vote to

amend and restate the Company's  2014 Omnibus Incentive Plan.

152.    The 2018 Proxy Statement was false and misleading because, despite assertions to

the contrary, the Code of Conduct and Code of Ethics were not followed, as evidenced by the

numerous false and misleading statements herein, and the Individual Defendants' failures to report

violations of the Code of Conduct and Code of Ethics.

153.    The 2018 Proxy Statement also failed to disclose *inter alia*, that: (1) the Company's $1.49 billion deduction pursuant to the Settlement was improper and undertaken for the sole purpose of artificially inflating the Company's financials and stock price; (2) the Company had appointed EY as its auditor as the result of a flawed and conflicted process and for the sole purpose of colluding in the improper tax deduction and related accounting; (3) the Company's earnings, cash flows, and operating income were overstated during the Relevant Period; (4) as a result of the foregoing, the Company's financial statements were materially false and misleading and violated the tenets of GAAP; and (5) the Company failed to maintain internal controls.

154.    As a result of the material misstatements and omissions contained in the 2018 Proxy Statement, Company shareholders approved the appointment of EY as auditor for 2018, and the amendment and restatement of the 2014 Omnibus Incentive Plan.

### *May 7, 2018, 10-Q*

155.    On May 7, 2018, the Company filed with the SEC its quarterly report on Form 10-Q for the quarter ended March 31, 2018 (the "1Q 2018 10-Q").  The 1Q 2018 10-Q was signed by Defendant Stiehl.  Attached to the 1Q 2018 10-Q were SOX certifications signed by Defendants Doheny and Stiehl attesting to the accuracy of the 1Q 2018 10-Q.

156.    The 1Q 2018 10-Q reiterated:  "The following are important factors that we believe could cause actual results to differ materially from those in our forward-looking statements: global economic and political conditions . . . the tax benefit associated with the Settlement agreement . . ."

157.    The 1Q 2018 10-Q further reiterated that "[t]he [IRS] is currently auditing the 2011-2014 consolidated U.S. federal income tax returns of the Company. Included in the audit of the 2014 return is the examination by the [IRS] with respect to the Settlement agreement deduction

and the related carryback to tax years 2004-2012. The outcome of the examination may require us to return a portion of the refund."

158.    The statements in ¶¶ 105-157 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) the Company's $1.49 billion deduction pursuant to the Settlement was improper and undertaken for the sole purpose of artificially inflating the Company's financials and stock price; (2) the Company had appointed EY as its auditor as the result of a flawed and conflicted process and for the sole purpose of colluding in the improper tax deduction and related accounting; (3) the Company's earnings, cash flows, and operating income were overstated during the Relevant Period; (4) as a result of the foregoing, the Company's financial statements were materially false and misleading and violated the tenets of GAAP; and (5) the Company failed to maintain internal controls.  As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

159.    In addition, Item 303 required all of the Company's 10-Qs and 10-Ks filed during the Relevant Period to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  The Individual Defendants' failure to indicate EY's lack of independence constitute a failure to adhere to Item 303 because the lack of independence was a known uncertainty that the Individual Defendants reasonably should have expected would have a material unfavorable impact on the Company's revenues and income from continuing operations.

### The Truth Fully Emerges

#### August 6, 2018 Form 10-Q

160.     On August 6, 2018, the Company filed with the SEC its quarterly report on Form 10-Q for the quarter ended June 30, 2018 (the "2Q 2018 10-Q").

161.     The 2Q 2018 10-Q disclosed that the SEC had issued the June 2018 Subpoena, which requested documents and information related to the Company's accounting policies and procedures for income taxes, financial reporting, and disclosures.

162.     The June 2018 Subpoena was widely interpreted as pertaining to the Company's treatment of the $1.49 billion tax deduction, and the SEC investigation severely undermined the Company's purported defenses to the disallowance.

163.     The news of the June 2018 Subpoena caused the Company's stock price to drop 5% to close at $41 per share on August 7, 2018.  In the weeks that followed, the stock price would plummet to just over $30 per share by October 2018.

#### The June 20, 2019 Form 8-K and Press Release

164.     On June 20, 2019, the Company filed with the SEC a Form 8-K (the "June 20, 2019 8-K") and issued a press release (the "June 20, 2019 Press Release") disclosing that it had fired Defendant Stiehl "for cause" subsequent to receiving the June 2019 Subpoena from the SEC.   The Company explained that the June 2019 SEC Subpoena sought documents concerning Sealed Air's procedure in selecting EY as its auditor, raising further questions about EY's purported independence.

#### August 2, 2019 10-Q

165.     On August 2, 2019, the Company filed with the SEC its quarterly report on Form 10-Q for the quarter ended June 30, 2019 (the "2Q 2019 10-Q").  The 2Q 2019 10-Q revealed that

a criminal investigation had been initiated as to the circumstances surrounding Defendant Stiehl's

termination.  The 2Q 2019 10-Q stated in relevant part:

> ***We are involved in ongoing investigations by the U.S. Department of Justice and U.S. Securities and Exchange Commission, the results of which could adversely impact our business and results of operations and our ability to comply with certain obligations imposed by federal securities laws and other applicable rules.***
>
> The Company has received from the staff of the SEC subpoenas for documents and requests for information in connection with the SEC's previously disclosed investigation. Those subpoenas and requests seek documents and information regarding the Company's accounting for income taxes, its financial reporting and disclosures, the process by which the Company selected its independent audit firm beginning with fiscal year 2015, the independence of that audit firm, and other matters. The Company has also received a Grand Jury subpoena from the U.S. Attorney's Office seeking documents relating to the termination of our former CFO and relating to the process by which the Company selected its independent audit firm beginning with fiscal year 2015.
>
> The Company is fully cooperating with the SEC and the U.S. Attorney's Office. However, we cannot predict the outcome or duration of either of those investigations and there can be no guarantee as to the amount of internal and external resources we may need to devote to responding to any further requests we may receive from the SEC and/or the U.S. Attorney's Office. In addition, if the SEC and/or the U.S. Attorney's Office were to charge the Company with violations, we could potentially be subject to fines, penalties or other adverse consequences, and our business and financial condition could be adversely impacted. Furthermore, any determination that the Company's audit firm was not independent could require that certain of our historical financial statements be re-audited by a new independent registered public accounting firm which could affect our ability to comply with certain reporting obligations imposed by federal securities laws.

(Emphasis in original.)

### *August 12, 2019 8-K*

166.    On August 12, 2019, the Company filed with the SEC a Form 8-K (the "August 12,

2019 8-K") stating that it had dismissed EY, and stating further that "the pendency of the SEC

investigation, along with the Committee's dissatisfaction with information it learned about the

process by which EY was selected as auditor, caused the Company to make this change now to

allow for an orderly transition for the audit of the Company's fiscal 2019 consolidated financial

statements and to minimize the risk of disruption that could arise in the event of an unplanned change in independent auditors at an undetermined time in the future."

### Repurchases During the Relevant Period

167.   During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company due to the fact that the stock price was artificially inflated due to the Individual Defendants' fraudulent scheme.

168.   According to the 2014 10-K, upon information and belief, the Company purchased 639,514 shares of its common stock during the beginning of the Relevant Period starting November 8, 2014 to December 31, 2014, for approximately $25.3 million, at an average price of $39.82 per share.

169.   According to the May 2015 10-Q, the Company purchased 72,280,126 shares of its common stock during the first fiscal quarter of 2015 for approximately $72.2 million, at an average price of $44.56 per share.

170.   According to the August 2015 10-Q, the Company purchased 1,768,579 shares of its common stock during the second fiscal quarter of 2015 for approximately $87.8 million, at an average price of $49.67 per share.

171.   According to the November 2015 10-Q, the Company purchased 11,367,701 shares of its common stock during the second fiscal quarter of 2015 for approximately $578.8 million, at an average price of $50.92 per share.

172.   According to the 2015 10-K, the Company purchased 1,674,172 shares of its common stock (excluding 8,394 shares forfeited pursuant to the Company's Omnibus Incentive Plan and shares withheld for tax obligations and charges)  during the fourth fiscal quarter of 2015 for approximately $77.8 million, at an average price of $46.47 per share.

173.     According to the May 2016 10-Q, the Company purchased 1,242,830 shares of its common stock during the first fiscal quarter of 2016 for approximately $56.9 million, at an average price of $45.75 per share.

174.     According to the August 2016 10-Q, the Company purchased 462,146 shares of its common stock (excluding 23,720 shares forfeited pursuant to the Company's Omnibus Incentive Plan) during the second fiscal quarter of 2016 for approximately $21.2 million, at an average price of $45.91 per share.

175.     According to the October 2016 10-Q, the Company purchased 3,568,988 shares of its common stock (excluding 17,29 shares forfeited pursuant to the Company's Omnibus Incentive Plan) during the third fiscal quarter of 2016 for approximately $166.1 million, at an average price of $46.53 per share.

176.     According to the 2016 10-K, the Company purchased 192,960 shares of its common stock during the fourth fiscal quarter of 2016, all of which were either forfeitures under the Company Omnibus Incentive Plan or shares withheld for tax obligations and charges.

177.     According to the May 2017 10-Q, the Company purchased 472,725 shares of its common stock during the first fiscal quarter of 2017, all of which were forfeited pursuant to the Company's Omnibus Incentive Plan.

178.     According to the August 2017 10-Q, the Company purchased 5,783,143 shares of its common stock during the second fiscal quarter of 2017 for approximately $251.7 million, at an average price of $43.53 per share.

179.     According to the November 2017 10-Q, the Company purchased 9,832,864 shares of its common stock (excluding 24,609 shares forfeited pursuant to the Company's Omnibus

Incentive Plan) during the third fiscal quarter of 2017 for approximately $431.5 million, at an average price of $43.88 per share.

180.    According to the 2017 10-K, the Company purchased 11,879,985 shares of its common stock (excluding 6,691 shares forfeited pursuant to the Company's Omnibus Incentive Plan) during the fourth fiscal quarter of 2017 for approximately $542.7 million, at an average price of $48.68 per share.

181.    According to the May 2018 10-Q, the Company purchased 8,955,548 shares of its common stock (excluding 1,186 shares forfeited pursuant to the Company's Omnibus Incentive Plan) during the first fiscal quarter of 2018 for approximately $392.8 million, at an average price of $43.86 per share.

182.    According to the August 2018 10-Q, the Company purchased 1,808,583 shares of its common stock during the second fiscal quarter of 2018 for approximately $78.3 million, at an average price of $43.29 per share.

183.    According to the November 2018 10-Q, upon information and belief, the Company purchased 2,373,371 shares of its common stock from July 1, 2018 to August 6, 2018 during the third fiscal quarter of 2018 for approximately $97.8 million, at an average price of $41.20 per share.

184.    As the Company's stock was actually only worth $41.00 per share, the price at closing on August 7, 2018, the Company overpaid millions of dollars for repurchases of its own stock during the Relevant Period.

## **DAMAGES TO SEALED AIR**

185.    As a direct and proximate result of the Individual Defendants' conduct, Sealed Air has lost and expended, and will continue to lose and expend, many millions of dollars.

186.    Such expenditures include, but are not limited to, legal fees and payments associated with the Securities Class Action, the SEC investigation, the criminal inquiry initiated by the U.S. Attorney of the Western District of North Carolina, as well as the Audit Committee Investigation, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

187.    Such losses include, but are not limited to, excessive compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

188.    As a direct and proximate result of the Individual Defendants' conduct, Sealed Air has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

189.    Plaintiff brings this action derivatively and for the benefit of Sealed Air to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Sealed Air, waste of corporate assets, unjust enrichment, and violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act as well as the aiding and abetting thereof.

190.    Sealed Air is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

191.    Plaintiff is a current shareholder of Sealed Air and has continuously held Sealed Air common stock during all relevant times. Plaintiff will adequately and fairly represent the

interests of Sealed Air in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

192.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

193.    A pre-suit demand on the Board of Sealed Air is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following nine individuals: Defendants Doheny, Chu, Duff, Keizer, Kosecoff, Lustig, and Whitaker (the "Director-Defendants"), and non-parties Francoise Colpron and Hal Lawton (together with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to five of the nine Directors who are on the Board at the time this action is commenced.

194.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

195.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making the materially false and misleading statements alleged herein.   The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

196.     Additional reasons that demand on Defendant Doheny is futile follow. Defendant Doheny has served as the Company's CEO since January 2018.  He also serves as a member of the Board. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Doheny with his principal occupation, and he receives handsome compensation, including $8,934,227 during the fiscal year ended December 31, 2018. Defendant Doheny was ultimately responsible for many of the false and misleading statements and omissions that were made in the Relevant Period. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Doheny is a defendant in the Securities Class Action. For these reasons, too, Defendant Doheny breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

197.     Additional reasons that demand on Defendant Chu is futile follow. Defendant Chu is a co-founder of the Company and has served as a Company director since 2002. He also serves as a member of the Organization and Compensation Committee. Defendant Chu receives handsome compensation, including $215,025 during the fiscal year ended December 31, 2018. As a long-time Company director he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Chu signed, and thus personally made the false and misleading statements in the 2014 10-K, the 2015 10-K, the 2016 10-K, and

the 2017 10-K. For these reasons, too, Defendant Chu breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

198.     Additional reasons that demand on Defendant Duff is futile follow. Defendant Duff has served as a Company director since 2010. He also serves as the Chair of the Nominating and Corporate Governance Committee and is a member of the Audit Committee. Defendant Duff receives handsome compensation, including $230,040 during the fiscal year ended December 31, 2018. As a long-time Company director he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Defendant Duff signed, and thus personally made the false and misleading statements in the 2014 10-K, the 2015 10-K, the 2016 10-K, and the 2017 10-K. For these reasons, too, Defendant Duff breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

199.     Additional reasons that demand on Defendant Keizer is futile follow. Defendant Keizer has served as a Company director since 2016 and serves on the Nominating and Corporate Governance Committee and serves as the Chair of the Audit Committee. Defendant Keizer receives handsome compensation, including $226,275 during the fiscal year ended December 31, 2018. As a Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Keizer signed, and thus personally

made the false and misleading statements in the 2016 10-K and the 2017 10-K. For these reasons, too, Defendant Keizer breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

200.    Additional reasons that demand on Defendant Kosecoff is futile follow. Defendant Kosecoff has served as a Company director since 2005. She also serves as a member of the Nominating and Corporate Governance Committee and as Chair of the Organization and Compensation Committee.  Defendant Kosecoff receives handsome compensation, including $232,525 during the fiscal year ended December 31, 2018. As a Company director she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Kosecoff signed, and thus personally made the false and misleading statements in the 2014 10-K, 2015 10-K, 2016 10-K, and 2017 10-K. For these reasons, too, Defendant Kosecoff breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

201.    Additional reasons that demand on Defendant Lustig is futile follow. Defendant Lustig has served as a Company director since 2015. He also serves as a member of the Audit Committee and Corporate Governance Committee. Defendant Lustig receives handsome compensation, including $222,525 during the fiscal year ended December 31, 2018. As a long-time Company director and member of the Audit Committee, he conducted little, if any, oversight of the Company's engagement in the scheme to engage in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets.

Furthermore, Defendant Lustig signed, and thus personally made, the false and misleading statements in the 2015 10-K, 2016 10-K, and the 2017 10-K. For these reasons, too, Defendant Lustig breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

202.     Additional reasons that demand on Defendant Whitaker is futile follow. Defendant Whitaker has served as Chairman of the Board since 2018 and as a Company director since 2012. Defendant Whitaker receives handsome compensation, including $344,290 during the fiscal year ended December 31, 2018. As a long-time Company director and as Chairman of the Board, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Whitaker signed, and thus personally made, the false and misleading statements in the 2015 10-K, 2016 10-K, and the 2017 10-K. For these reasons, too, Defendant Whitaker breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

203.     Additional reasons that demand on the Board is futile follow.

204.     Defendants Duff, Keizer, and Lustig (the "Audit Committee Defendants") served on the Company's Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants were responsible for overseeing, *inter alia*, the Company's financial reporting and disclosure process, the effectiveness of the Company's internal controls, and the Company's compliance with applicable laws, regulations, and accounting standards. The Audit Committee Defendants failed to ensure the integrity of the Company's financial statements and internal controls, and the Company's compliance with applicable

accounting standards, as they are charged to do under the Audit Committee Charter, allowing the Company to engage in improper accounting methods and to file false and misleading financial statements with the SEC. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

205.    Additionally, the Director-Defendants individually and collectively, face a substantial likelihood of liability as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay by millions of dollars for its own common stock during the Relevant Period. The Directors, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company that caused the Company's stock price to be artificially inflated and yet approved the repurchases. Thus, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

206.    Additionally, the Director-Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and should have ensured that the Company maintained adequate oversight and internal controls over its disclosures. Thus, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

207.    In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of the Exchange Act. In

violation of the Code of Conduct, the Director-Defendants failed to comply with the law. Thus, the Director-Defendants face a substantial likelihood of liability, and demand is futile as to them.

208.    Sealed Air has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Sealed Air any part of the damages Sealed Air suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

209.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

210.    The acts complained of herein constitute violations of fiduciary duties owed by Sealed Air officers and directors, and these acts are incapable of ratification.

211.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Sealed Air. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter*

*alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Sealed Air, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

212.   If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Sealed Air to sue the Individual Defendants named herein, as, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

213.   Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of
### Section 14(a) of the Exchange Act

214.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

215.   The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

216.     Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

217.     Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

218.     Under the direction and watch of the directors, the 2017 and 2018 Proxy Statements (the "Proxy Statements") failed to disclose, *inter alia*, that: (1) the Company's $1.49 billion deduction pursuant to the Settlement was improper and undertaken for the sole purpose of artificially inflating the Company's financials and stock price; (2) the Company had appointed EY as its auditor as the result of a flawed and conflicted process and for the sole purpose of colluding in the improper tax deduction and related accounting; (3) the Company's earnings, cash flows, and operating income were overstated during the Relevant Period; (4) as a result of the foregoing, the Company's financial statements were materially false and misleading and violated the tenets of GAAP; and (5) the Company failed to maintain internal controls.  As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

219.    The Proxy Statements also made references to the Code of Conduct. The Code of Conduct required the Company and the Individual Defendants to abide by relevant laws and regulations, make accurate and non-misleading public disclosures, and not engage in insider trading. By issuing false and misleading statements to the investing public and engaging in insider trading, certain of the Individual Defendants violated the Code of Conduct. The Proxy Statements failed to disclose these violations and also failed to disclose that the Code of Conduct's terms were being violated.

220.    In the exercise of reasonable care, certain of the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the Proxy Statements, including, but not limited to, election of directors, ratification of an independent auditor, amendment and restatement of the 2014 Omnibus Incentive Plan, and advisory approval of executive compensation.

221.    The false and misleading statements made in the 2018 Proxy Statement led to the approval of the amendment and restatement of the 2014 Omnibus Incentive Plan.

222.    The false and misleading statements made in the Proxy Statements led to the re-election of Defendants Doheny, Peribere, Codey, Chu, Duff, Keizer, Kosecoff, Lustig, Manning, Marino, Wambold, and Whitaker, which allowed them to continue breaching their fiduciary duties to Sealed Air.

223.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy Statements.

224.    Plaintiff on behalf of Sealed Air has no adequate remedy at law.

## SECOND CLAIM

**Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act**

225.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

226.     The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Sealed Air. Not only is Sealed Air now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also a victim of the unlawful scheme perpetrated upon Sealed Air by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices during the Relevant Period due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase its own shares at artificially-inflated prices, damaging Sealed Air.

227.     During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

228.     The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Sealed Air not misleading.

229.     The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control

and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Sealed Air. The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

230.    In addition to each of the Individual Defendants approving the issuance of the Company's false and misleading statements while they were serving as a senior executive and/or director of the Company, they made and/or signed the Company's Form 10-Ks filed with the SEC during the Relevant Period.

231.    By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

232.    Plaintiff, on behalf of Sealed Air, has no adequate remedy at law.

## THIRD CLAIM

### Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act

233.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

234.    The Individual Defendants, by virtue of their positions with Sealed Air and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Sealed Air and

each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Sealed Air and the other Individual Defendants to engage in the illegal conduct and practices complained of herein.

235.     Plaintiff, on behalf of Sealed Air, has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

236.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

237.     Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Sealed Air's business and affairs.

238.     Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

239.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Sealed Air.

240.     In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

241.     In further breach of their fiduciary duties owed to Sealed Air, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company's $1.49 billion deduction pursuant to the Settlement was improper and undertaken for the sole

purpose of artificially inflating the Company's financials and stock price; (2) the Company had appointed EY as its auditor as the result of a flawed and conflicted process and for the sole purpose of colluding in the improper tax deduction and related accounting; (3) the Company's earnings, cash flows, and operating income were overstated during the Relevant Period; (4) as a result of the foregoing, the Company's financial statements were materially false and misleading and violated the tenets of GAAP; and (5) the Company failed to maintain internal controls.  As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times..

242.    The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

243.    In breach of their fiduciary duties, two of the Individual Defendants engaged in lucrative insider sales while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein.

244.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales.

245.     The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

246.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

247.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Sealed Air has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

248.     Plaintiff on behalf of Sealed Air has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Unjust Enrichment

249.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

250.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Sealed Air.

251.     The Individual Defendants either benefitted financially from the improper conduct, and their making lucrative insider sales or received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Sealed Air that was tied to the performance or artificially inflated valuation of Sealed Air, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

252.     Plaintiff, as a shareholder and a representative of Sealed Air, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

253.     Plaintiff on behalf of Sealed Air has no adequate remedy at law.

### SIXTH CLAIM

**Against Individual Defendants for Waste of Corporate Assets**

254.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

255.     As a further result of the foregoing, the Company has lost millions of dollars due to its overpayments for the shares of its own stock that it repurchased, and the Company will incur many millions of dollars of legal liability and costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

256.     As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

257.     Plaintiff on behalf of Sealed Air has no adequate remedy at law.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of Sealed Air, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to Sealed Air;

(c)     Determining and awarding to Sealed Air the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Sealed Air and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Sealed Air and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1.  a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.  a provision to permit the shareholders of Sealed Air to nominate at least five candidates for election to the Board; and

3.  a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Sealed Air restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


Dated: January 14, 2020

Of Counsel:

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
275 Madison Avenue, 34th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
240 Townsend Square
Oyster Bay, NY 11771
Tel: (516) 922-5427
Fax: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

Respectfully submitted,

**FARNAN LLP**

/s/ Michael J. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market St., 12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
Email: bfarnan@farnanlaw.com
        mfarnan@farnanlaw.com

*Attorneys for the Plaintiff*